In re CRADDOCK–TERRY SHOE
CORP., et al, Debtor.

CRADDOCK–TERRY SHOE
CORP., Plaintiff,

v.

CRESTAR BANK, f/k/a United
Virginia Bank, Defendant.

Bankruptcy No. 687–01155.   Adv.
No. 688–0041.

United States Bankruptcy Court,
W.D. Virginia,
Lynchburg Division.

Sept. 15, 1988.

Summit, Rovins & Feldesman, New York City, and Michie, Hamlett, Donato & Lowry, Charlottesville, Va., for plaintiff.

Joseph C. Knakal, Jr. and Leighton S. Houck, Lynchburg, Va., for defendant.

## MEMORANDUM OPINION

WILLIAM E. ANDERSON, Bankruptcy Judge.

This case concerns the retention of two sums of money by the defendant, Crestar Bank, f/k/a United Virginia Bank ("Crestar"), with whom the debtor, Craddock–Terry Shoe Corporation ("Craddock–Terry"), had a checking account. The first sum, $16,000, resulted from an accidental overpayment which occurred when another bank encoded one of the debtor's checks with an incorrect magnetic code. The second sum, $160,433.15, resulted from an offset by Crestar of funds in the debtor's bank account against an unsecured debt owed Crestar by the debtor, shortly before the debtor filed its Chapter 11 petition. The debtor, acting as a debtor in possession, seeks to recover the full amount of the $16,000, and any amount by which Crestar "improved its position" (pursuant to 11 U.S.C. § 553(b)) by effecting the setoff. The facts underlying the disputes over these two sums are not directly related, and the court will treat them separately.

### A. The Accidental $16,000.00 Overpayment

Craddock–Terry filed its petition on October 21, 1987. In September 1987, Craddock–Terry had delivered a check, drawn on its Crestar account, to one of its suppliers. The supplier apparently took that check to its own bank to cash it. Although the check was drawn in the amount of only $1777.16, the supplier's bank improperly, and most likely accidentally, placed a magnetic code on the check which read $17,777.16. When Crestar subsequently received the check for payment in late September 1987, its magnetic decoder decoded the improper, higher amount, and as a result Crestar debited Craddock–Terry's account $16,000 more than it should have.

Craddock–Terry did not discover this error until December 1987, well after it had filed its petition. The debtor informed Crestar, who then took action to recover the money from the supplier's bank. The latter sent Crestar a cashier's check for $16,000.00 dated January 20, 1988. Crestar has held the $16,000.00 sum, asserting an administrative freeze on the money, and on July 5, 1988 (after the commencement of this proceeding), filed a motion to lift the automatic stay in order to offset the $16,000.00 against the amount the debtor owes Crestar.

Craddock–Terry claims that Crestar's asserted administrative freeze is improper. First, Craddock–Terry argues that the freeze was actually a setoff, and that as such it was improper because it occurred in September 1987 (on the day that Crestar made the $16,000 overpayment) before Craddock–Terry was in default under its loan agreement with Crestar. Second, the debtor asserts that Crestar's handling of the freeze, if it was one, was not proper, since it has kept the cashier's check intact, rather than crediting the amount to the debtor's account, and since it did not promptly file a motion to lift the automatic stay for the purpose of allowing it to offset the $16,000.00, but waited until July 1988.

Crestar's action regarding the $16,000 did not constitute a setoff, either in September 1987, when it erroneously paid out the extra $16,000.00, or in or after January 1988, when it received the money back and put an administrative freeze on it. The September 1987 overpayment was sim-

ply a mistake, as the bank admits. A bank officer testified that the bank had no knowledge that it was making an overpayment, the debtor does not dispute this, and consequently the bank could not have been offsetting the $16,000.00 against Craddock–Terry's debt.

■ Although there appears to be some split of authority concerning the propriety of administrative freezes by banks, they have been found to be appropriate in this district. *See Kenney's Franchise Corp. v. Central Fidelity Bank, N.A., Lynchburg,* 22 B.R. 747 (W.D.Va.1982). Furthermore this court agrees with the reasoning of Judge Turk in *Kenney's* and with other opinions that have allowed administrative freezes in similar circumstances. *See, e.g., In re Edgins,* 36 B.R. 480 (Bankr. 9th Cir.1984); *In re Williams,* 61 B.R. 567 (Bankr.N.D.Tex.1986). As stated in *Edgins,*

> [decisions which have held to the contrary] put the burden on the wrong party. Creditors with a valid right of setoff under 11 U.S.C. Section 553 would be required to turnover to the debtor funds subject to setoff and thereafter attempt to obtain an order from the court to preclude the debtor from improvidently dissipating the funds. This will, all too often, be an attempt to lock the barn door after the horse has been stolen. The shield of 11 U.S.C. Section 362, which is procedural and vests no intrinsic interest in property to the estate, should not be used as a sword to divest other parties of legitimate interests in property particularly where the debtor has the knowledge and means to bring whatever claim he may have for use of the funds on for prompt hearing.

*In re Edgins,* 36 B.R. at 484. In this case, the debtor could have provided adequate protection and sought court approval to use the $16,000.00 pursuant to 11 U.S.C. section 363(c)(2)(B). *Kenney's* 22 B.R. at 749.

This reasoning also demonstrates that Crestar was under no obligation to immediately file its motion to lift stay; the debtor itself was obligated to seek court authority under section 363(c)(2)(B) to use the money.

Crestar's action in this case was substantially similar to that of Central Fidelity Bank in *Kenney's* (that bank did not even file a motion to lift stay), and was not improper. *See In re Edgins* 36 B.R. at 483–84 (obligation is on debtor to seek use of funds pursuant to section 363).

■ Furthermore, failure to cash the cashier's check and actually credit Craddock–Terry's account cannot be said to have been an improper implementation of an administrative freeze. This action, or inaction, simply assured the bank that the funds could not be accessed by the debtor. Similarly, this prevented Crestar from making use of the money or exercising such control over it as to have actually effected a setoff. Keeping the cashier's check intact was actually the easiest way to administer a freeze of these funds. *See In re Air Atlanta, Inc.,* 74 B.R. 426, 427 (Bankr. N.D.Ga.), *aff'd,* 81 B.R. 724 (N.D.Ga.1987) (unlinking debtor's sub-accounts from its master account easiest method to administer freeze).

### B. The $160,433.15 Setoff

■ The setoff effected by Crestar several days before Craddock–Terry filed its petition poses a more difficult question for the court, for which the court and the parties have found no precedent. This problem concerns application of the 90 day "improvement of position" test of Bankruptcy Code section 553(b)(1) (11 U.S.C. § 553(b)(1)), when deposits have been made to a debtor's bank account *during* the ninetieth day before the day on which the petition was filed. The question, simply put, is whether those deposits should be included for purposes of the test.

On October 19, 1987, approximately two days before the petition was filed, Crestar offset $160,433.15 from Craddock–Terry's account against an outstanding loan amount due from Craddock–Terry. Craddock–Terry was in default at that time under the provisions of the loan agreement, and the court finds that Crestar complied with the default provisions of that agreement. The court also finds credible Crestar's explanation concerning bookkeeping

errors and corrections which showed up on the debtor's account statement indicating that the $160,433.15 sum was returned to the account on October 20 and then offset again on October 21, and finds that only one offset occurred, on October 19, 1987, and that no offset of funds occurred on October 21, 1987.

Section 553(b) provides that:

(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 365(h)(2), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C. § 553. The parties do not dispute that section 553(b) applies. They agree that it does, and that to apply it, the court should calculate the insufficiency on the date of the setoff and the insufficiency ninety days before the date of the filing of the petition, compare the two, and award Craddock–Terry the amount, if any, by which the latter exceeds the former.

The petition was filed on October 21, 1987 at 4:25 p.m. July 23, 1987 was the ninetieth day before October 21, 1987. In July 1987 the debtor apparently was already in financial trouble, and was in the practice of calling Crestar each day to ascertain the opening balance in its checking account. It would then have First National Bank of Chicago ("First Chicago") wire to Crestar the amount of money Craddock–Terry anticipated would be necessary to cover the checks which would be presented at Crestar that day. The debtor did this on July 23, 1987, and First Chicago wired $135,000 into Craddock–Terry's checking account at 4:00 p.m. on that day. Such wire transfers were available for Craddock–Terry's use immediately.

The 4:00 p.m. transfer on July 23 creates the problem. Both parties agree that Craddock–Terry owed Crestar $292,163.51 on July 23, 1987. Both agree that the opening balance was $32,710.91 on July 23, 1987. But when it comes to calculating the insufficiency "90 days before date of the filing of the petition," the parties disagree. Craddock–Terry insists that the court should subtract only the opening balance from the loan amount due, while Crestar of course claims the court should add the 4:00 p.m. transfer to the opening balance before subtracting it from the loan amount due (ordinary deposits and payments for checks presented customarily were not added to or subtracted from the account balance until late in the evenings, and thus none enter into the calculations here). Craddock–Terry therefore claims that the insufficiency on July 23 was $259,452.60; Crestar claims it was $124,452.60.

Craddock–Terry's argument is that the ninety day period in section 553 should include the full ninety days immediately prior to the day on which the petition was filed, so as to include the entire ninetieth day (July 23, 1987) before filing. The debtor claims that this analysis would fit the facts of this case since Crestar would regularly give Craddock–Terry the opening balance for the account in response to Craddock–Terry's daily requests for an account balance, regardless of the time of day at which the debtor requested a balance. The debtor also points out that the wire transfer from First Chicago came in at 4:00 p.m., two hours after Crestar had closed its doors to customers.

Crestar presents alternative bases on which to support its position. First, it argues, the purpose of the code section is to keep the creditor in the same position it would have been in had it effected a setoff ninety days prior to filing. Therefore, it

argues, the court should take the First Chicago wire transfer into account because if Crestar were to have offset the money in the account on July 23, it would have waited until the transfer had come in (which is just what it did on October 19, the day of the actual offset). Alternatively, Crestar argues that since the petition was not filed until 4:25 p.m. on October 21, the insufficiency should be based on the amount in Craddock–Terry's account at 4:25 p.m. on July 23, which was exactly ninety days before the actual filing.

Under any analysis, there was always an insufficiency. Therefore subsection (b)(1)(A) of section 553 applies, rather than subsection (b)(1)(B). Both subsections use the phrases "90 days" and "date of the filing of the petition." Each of these phrases is subject to more than one interpretation.[1] Therefore, the court is concerned that its resolution of this issue can be applied with ease and consistency.

Accordingly, this court interprets "90 days before the date of the filing of the petition" to mean the 2160 hours (90 times 24 hours) before the hour and minute at which the petition was filed. In this case, that means 4:25 p.m. on July 23, 1987. This interpretation provides a clear rule which is easy to apply. Furthermore, it follows the ordinary and plain meaning of the language of the statute. Ninety days means ninety days; it should not be stretched to mean ninety days plus part of another day.

The fact that Crestar gave the debtor its opening balance for the days when the debtor called in, even when the debtor called in the middle of the day, is of little consequence. It is apparent from the testimony that the debtor's representative knew that the opening balance was being quoted, and that is what the debtor wanted when it called. Similarly, even though the wire transfer came in in this case after Crestar had closed its doors to the public, the money transferred was intended by both par-

ties to be credited to Craddock–Terry's account immediately.

Moreover, this analysis allows for consistency in interpreting subsection (b)(1)(B) of section 553. That subsection is meant to apply in cases when no insufficiency existed ninety days before the filing of the petition, but one developed during the ninety day period. In such a case, the insufficiency on the date of the offset is compared to the insufficiency on "the first date during the ninety days immediately preceding the date of the filing of the petition." 11 U.S.C. § 553(b)(1)(B). Any later change in the amount of the insufficiency should be disregarded, until the offset. *See* 4 *Collier on Bankruptcy* ¶ 553.08[3], p. 553–43 (15th ed. 1987).

This intended effect of subsection (b)(1)(B) requires that the term "date" be interpreted to include the time of day. Suppose, for instance, that the first insufficiency occurred on the fortieth day at 11:00 a.m., when a hypothetical debtor withdrew enough funds from its bank account so that the account balance dropped to $5000.00 below the balance due on a loan from the bank to the debtor, and that the bank later effected an offset on the tenth day. If the debtor had deposited or withdrawn money into or from its account on the thirty-ninth day, the intervening insufficiency would be ignored and the section 553(b)(1)(B) analysis would not be changed: the comparison unquestionably would be between the insufficiencies on the tenth and fortieth days. But suppose that the debtor had made a $5000.00 deposit (or wire transfer) at 4:55 p.m. on the fortieth day. That afternoon transfer would have to be ignored also. Otherwise, the net insufficiency for the entire fortieth day would arguably be zero, resulting in no application of subsection (b)(1)(B). The intent of the subsection however is to consider the *first* insufficiency. Thus, the "first date" should include the time of day in situations in which the time

---

1. "90 days" could be interpreted to mean any set of 2160 consecutive hours (2160 = 90 × 24); or to mean 90 consecutive calendar days, starting just after midnight on the first day and ending at midnight on the 90th. "Date of the filing of

the petition" could be interpreted to mean the entire calendar day, from midnight to midnight, during which the petition was filed; or to mean the precise time of day at which the petition was filed (such as October 21, 1987 at 4:25 p.m.).

of day would make a difference and can be proven. And to be consistent, "date" should be interpreted the same throughout the code section.[2]

■ The court is aware that many cases considering the ninety day preference period of Bankruptcy Code section 547 (11 U.S.C. § 547) have applied Bankruptcy Rule 9006 in order to determine whether certain transactions actually occurred on or within ninety days of the date of the filing of the petition. That rule arguably would require the court to look back ninety days plus part of the petition date since its language excludes from the calculation the day of the act from which the time period is calculated.[3]

There has been substantial disagreement among the courts concerning the application of Rule 9006 to determine the section 547 preference period. Most of that litigation has concerned whether the code section and rule call for a forward count from the date of the alleged preferential transfer, or a backward count from the filing of the petition. Counting forward or backward has made a difference because of the second sentence of Rule 9006 concerning situations in which the last day of the period is a Saturday, Sunday, etc. In certain cases counting backward might result in a ninety day period while counting forward would result in a ninety-one or ninety-two day period (such as when a petition is filed on a Monday), or vice versa (such as when the ninetieth day is a Saturday or Sunday).

This problem developed for the simple reason that the structure of Rule 9006 was not designed for determining time periods that happened before a given event. The Rule contemplates calculating time periods allowed for the accomplishment of some second act, event, or default, such time periods to be computed from the time of a prior act, event, or default. "The Rule's references—to a time period 'begin[ning] to run,' to the 'last day of the period,' and to an extension 'until the end of the next day' simply do not fit the computation required by the Code." Andrew, *Computation of the Bankruptcy Preference Period: a Trap for Practitioners*, 90 Com.L.J. 170 (January 1985) (emphasis and bracketed material in original).

■ The Rule would exclude the day of the petition from the ninety day period; such a result is certainly not intended by the Code. Furthermore the Rule would allow the trustee or debtor in possession to recover money based on an insufficiency ninety-one, ninety-two, or even ninety-three days before the day the petition was filed.[4] Section 553(b)(1), however, plainly limits the look back period to only ninety days. *See In re Enterprise Fabricators*, 36 B.R. 220, 223 (Bankr.M.D.Tenn.1983) (Rule 9006

---

**2.** This court is not the first to consider fractions of a day with regard to section 553 of the Bankruptcy Code. In *In re Energy Cooperative, Inc.*, 32 B.R. 680 (Bankr.N.D.Ill.1983), the court considered the timing of the petition to allow offset by a creditor of a prepetition debt which arose on the day the petition was filed, but earlier in the day, against a prepetition claim of the creditor. Nor is this court the first to interpret the phrase "date of the filing of the petition" to include the hour and minute at which the petition was actually filed. *See Matter of Kleitz*, 6 B.R. 214, 216–17 (Bankr.D.Nev.1980) (Date of filing of the petition means the hour and minute, not the entire calendar day).

**3.** Rule 9006 states, in pertinent part, "[i]n computing any period of time prescribed or allowed by these rules ... or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Satur-

day, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

**4.** This aspect of Rule 9006 is the strongest indication that its purpose is not necessary or suited for application to section 553. The extension of the time period provided for in the Rule has absolutely no use in the setoff context using either a forward or backward count, because in neither case has a party been kept from accomplishing an act by a weekend day, holiday, etc. Using a forward count, there is no question that the petition was filed. Using a backward count, which this court deems proper, even if the ninetieth day is a weekend day, holiday, etc., an insufficiency will have existed or not, and its amount will be easily calculated.

may not enlarge ninety day preference period of section 547) (citing 28 U.S.C. § 2075). Since section 553(b)(1) concerns a period of time before the act of filing the petition, and since the purpose of Bankruptcy Rule 9006 is to determine the time available to act after a particular event, this court concludes that Bankruptcy Rule 9006 does not apply to section 553.

■ At 4:25 p.m. on July 23, 1987, exactly 90 days before the date of the filing of the petition, Craddock–Terry's account with Crestar contained $167,710.91. On that date Craddock–Terry owed Crestar $292,163.51 on its outstanding loan. Therefore the insufficiency ninety days before the date of the filing of the petition was $124,452.60. The loan amount due on October 19, 1987 was $285,331.50. Thus when Crestar offset the $160,433.15 on that day, the resulting insufficiency was $124,898.35. Effecting the setoff did not improve Crestar's position, and consequently Craddock–Terry is not entitled to any recovery from Crestar.

## CONCLUSION

First, Crestar's accidental $16,000.00 overpayment of Craddock–Terry's check in September 1987 was not a setoff, and its assertion of an administrative freeze on the $16,000.00 cashier's check which it received in January 1988, from the bank to which the overpayment had been made, was not improper. Second, Crestar's offset of $160,433.15 from Craddock–Terry's account on October 19, 1987 resulted in a greater insufficiency than the insufficiency ninety days before the date of the filing of the petition. Accordingly, the court will enter an order denying the relief requested by the debtor.

## ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is hereby
ORDERED and ADJUDGED
that the debtor, Craddock–Terry Shoe Corporation, is not entitled to any of the relief prayed for in its complaint, and, accordingly, it is further

ORDERED
that this proceeding be, and it hereby is, DISMISSED with prejudice.