**In re J.A.S. MARKETS, INC. t/a Meadville County Market, Debtor.**

**William PINEO, Trustee, Plaintiff,**

**v.**

**CHARLEY BROTHERS COMPANY, A DIVISION OF SUPER VALU STORES INC., Defendant.**

**Bankruptcy No. 86–00075E.**
**Adv. No. 87–0089.**

United States Bankruptcy Court,
W.D. Pennsylvania.

April 23, 1990.

Neal R. Brendel, Pittsburgh, Pa., for defendant.

P. Raymond Bartholomew, Sharon, Pa., for plaintiff.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Background

An involuntary Chapter 7 petition was filed against the debtor, J.A.S. Markets, Inc., trading as Meadville County Market, on February 14, 1986. The plaintiff, William Pineo, Esq., was appointed trustee ("Trustee").

The Trustee initiated the present adversary proceeding against Charley Brothers Company, a Division of Super Valu Stores, Inc. ("Super Valu"), alleging:

(1) a preference claim under § 547 of the Bankruptcy Code, 11 U.S.C. § 547, and

(2) claims for breach of fiduciary duty.

Super Valu filed a Motion for Summary Judgment denying receipt of a preference and asserting that the Trustee lacks standing to prosecute the claims for breach of fiduciary duty on behalf of the debtor's unsecured creditors. By order dated January 5, 1989, this court denied Super Valu's Motion for Summary Judgment. Thereafter, Super Valu sought from the United States District Court, Leave to Appeal from our conclusion that the Trustee has standing to pursue the fiduciary duty claims. The District Court has not yet acted on said request.

On November 15, 1989, we held a trial on the preference cause of action. No disposition is being made herein on the claims based upon breach of fiduciary duty.

### Facts

The debtor initiated the Meadville County Market venture in December 1984. The debtor obtained financing in the amount of $1,100,000 from the Marine Bank under an Industrial Development Authority transaction that was secured by a first lien on the debtor's used equipment.

Super Valu provided the debtor additional financing secured by a first lien on the debtor's present and after-acquired inventory, furniture, fixtures and new equipment and a second lien in debtor's used equipment.

On December 20, 1984, the debtor and Super Valu entered into a "County Market Retailer's Agreement" ("Retailer's Agreement"). Pursuant to the Retailer's Agreement, Super Valu served as the debtor's primary food supplier and provided signage, advertising, and other services to the debtor.

Super Valu provided, for a fee, an accounting service to the debtor. Under the accounting arrangement, the debtor established a bank account at Marine Bank and authorized Super Valu to sign checks thereon.

The debtor's bills arose primarily from four sources: (1) wages; (2) taxes; (3) amount owing to vendors other than Super Valu ("Outside Vendors"); and (4) amounts owing to Super Valu for products and services. The debtor informed Super Valu of wages and taxes owing and submitted invoices from Outside Vendors to Super Valu. Super Valu determined the total amount payable by the debtor for wages, taxes, Outside Vendors and to Super Valu. Super Valu then issued its checks in payment of the amounts due. Super Valu simultaneously drew a check to itself from the debtor's bank account for the amounts paid and for amounts owed to Super Valu. If there were insufficient funds in the debtor's checking account for payment of all bills due and owing, Super Valu relied upon debtor's determination of which creditors to pay and in what order.

Payment to the debtor's Outside Vendors was discontinued at various dates subsequent to September 13, 1985. No payments were made to Outside Vendors subsequent to November 8, 1985. Between November 15 and November 26, 1985, Super Valu made payments to itself from the debtor's checking account in the amount of $337,071.65. No Outside Vendors were paid during this period.

Sometime prior to November 25, 1985, the debtor and Super Valu reached an agreement whereby Super Valu took possession of the Meadville County Market premises and repossessed all inventory, furniture, trade fixtures and equipment situated therein. This was completed pursuant to an "Agreement for Taking Possession and Disposing of Collateral in Lieu of Foreclosure" ("Agreement for Taking") dated November 25, 1985. This Agreement for Taking was previously prepared by Super Valu and ready for execution by the debtor on November 25, 1985.

It is agreed by the parties that the debtor's assets acquired by Super Valu on November 25, 1985 had a value of $1,427,692.15, consisting of inventory of $293,678.93; cash of $3,679.22; equipment of $1,115,000; leasehold improvements of $9,600; and prepaid expenses of $5,734. Both parties agree that the debtor conducted business as usual between November 15 and November 25, 1985 and received daily deliveries of inventory items from its various vendors during said ten-day time frame. Therefore, the value of the debtor's assets, not including the debtor's checking account balance as of November 15, can be estimated to be equivalent to the $1,427,692.15 value which existed November 25, 1985.

As of the beginning of November 15, 1985, the debtor's balance due to Super Valu on the December 1984 promissory notes was $283,803.42 and the balance due on open account indebtedness was $414,376.14 as shown by Super Valu's account receivable card for the debtor. As of November 15, 1985, the balance due to Marine Bank was $914,492.95.

As of November 25, 1985, the debtor's balance due to Super Valu on the December 1984 promissory notes was $284,935.35 and the balance due on open account indebtedness was $305,697.63. The balance owed to Marine Bank was $916,840.33.

After taking possession of all the debtor's assets, Super Valu paid Marine Bank the balance of $916,840.33 in satisfaction of Marine Bank's first position on the debtor's used equipment. Super Valu then applied the remaining value of the debtor's assets, first to open account indebtedness with Super Valu, then to its balance owing under the December 1984 promissory notes. Super Valu has asserted a deficiency of $80,485.88. Accounts payable to Outside Vendors totalled $260,976.04 as of November 25, 1985. Outside Vendors have filed proofs of claim in the amount of $178,440.89.

The debtor has no remaining assets to allow for any payment to unsecured creditors.

## Discussion

It appears to this court that Super Valu and the Spagnolos, principals of the debtor, saw the end in sight. They decided upon an arrangement whereby Super Value would repossess all assets of the debtor as of November 25, 1985. Although the exact time this agreement was made is unknown, it certainly was made prior to November 25. This is evidenced by the fact that when representatives of the debtor went to Super Valu's office on November 25, the agreement was fully prepared and ready for execution. It is further evidenced by the lack of payment to Outside Vendors beginning September 13.

It is important to note that the Agreement for Taking provided that the Spagnolos individually were required to personally guarantee any deficiency owing to Super Valu after the repossession.

Therefore, it was in the Spagnolos' best interest to instruct Super Valu to cease payments to all unsecured creditors at the time this course of action was decided upon and to allow Super Valu to reduce its balance as much as possible.

The unsecured creditors were the ones harmed by this transaction. They were allowed to believe it was "business as usual" up to the date of repossession by Super Valu. Those unsecured creditors who were deemed unnecessary had their payments stopped as early as September 13, 1985. Others, whose products were necessary, received payments through November 8, 1985 at which time all payments

to suppliers other than Super Valu ceased. After November 15, 1985 Super Valu received payment of $337,071.65. The unsecured creditors who were unknowingly permitted to continue deliveries were left holding unsecured debt in the amount of $260,-976.04.

A fundamental purpose of Bankruptcy Code § 547 is to facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.

### A. Preference Period Dates

 A trustee may avoid as a preference the transfer of property of the debtor to a creditor upon proving the five elements of a preference as enumerated in 11 U.S.C. § 547(b). This section provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor.

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

No allegation has been made that Super Valu is an "insider" and thus the appropriate focus is the 90 day period prior to the date of the filing of the petition.

The parties disagree on the relevant dates. Super Valu asserts that simply counting back 90 days from February 13, 1986, the day prior to the filing of the petition, reveals that the preference period commenced on November 16, 1985. The Trustee asserts that the preference period commenced on November 15, 1985.

Bankruptcy Rule 9006(a) provides:

(a) *Computation.* In computing any period of time prescribed or allowed by these rules, by the local rules, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, ..., in which event the period runs until the end of the next day which is not one of the aforementioned days.

There is substantial disagreement among the courts concerning the application of Rule 9006 to determine the § 547 preference period. The litigation has concerned whether the code section and rule call for a forward count from the date of the alleged preferential transfer, or a backward count from the filing of the petition. *In re Antweil,* 97 B.R. 63 (Bankr.D.N.M.1989) (backward count); *In re Craddock–Terry Shoe Corp.,* 91 B.R. 392 (Bankr.W.D.Va.1988) (90–day period means 2,160 hours before the petition was filed); *In re Schneider,* 44 B.R. 961 (Bankr.W.D.Wis.1984) (backward count); *In re Fabmet Corp.,* 31 B.R. 414 (Bankr.W.D.N.Y.1983) (forward count); *In re Hogg,* 35 B.R. 292 (Bankr.D.S.D.1983) (forward count).

Counting forward or backward makes a difference because of the second sentence of Rule 9006 concerning situations in which the last day of the period is Saturday, Sunday, etc. If we count backward 90 days from the filing of the petition (not including the day of filing), the ninetieth day is Saturday, November 16, 1985. Following Rule 9006, the preference period runs until the end of the next day which is not a Saturday or Sunday, i.e., Friday, November 15, 1985. This is significant as the Trustee alleges the first in a series of

preferential transfers occurred on that date.

If we count forward 90 days, the preference period runs from November 16, 1985 through the date of filing.

The *Antweil* court found the preference statute instructive in counting the 90 day period:

> ■ the language of the statute is instructive, in my view. It provides that the transfer shall be voidable if it occurs "on or within 90 days before the date of the filing of the petition". It suggests that the count should be backward. It does not provide that the transfer is voidable if the petition is filed within 90 days thereafter. The operative date is the date of filing of the petition and the count should be from that date backward.

97 B.R. 63 at 64.

We agree that the count is backward from the date of filing. We further find that Rule 9006 requires us to extend the preference period from Saturday, November 16, 1985 to include the next day, Friday, November 15, 1985. Therefore, the Trustee may avoid any transfer to Super Valu from November 15, 1985 to the date of filing if the criteria set forth in § 547(b) are met.

### B. Effect of Floating Lien on Inventory

There is no dispute that Super Valu received cash transfers from the debtor on November 15, 1985 in the amount of $142,725.29; on November 18, 1985 in the amount of $5,879.42; on November 20, 1985 in the amount of $20,000; on November 22, 1985 in the amount of $162,298.73; and on November 26, 1985 in the amount of $6,168.21, which Super Valu applied to the balance owed by the debtor. Counsel for the Trustee has advised us that an additional $10,405.66 which remained in the debtor's bank account upon termination of the debtor's operations is no longer in question.

The parties also agree that pursuant to the Agreement for Taking, Super Valu acquired assets of the debtor on November 25, 1985 with a value of $1,427,692.15.

Accordingly, the first and second elements of a preference have been met. Property of the debtor was transferred to a creditor (Super Valu) on account of an antecedent debt owed by the debtor before such transfer was made.

With regard to the third element of a preference, Super Valu has not rebutted the presumption of insolvency set forth in 11 U.S.C. § 547(f) and as discussed previously, the transfers occurred within the preference period and thus, the fourth element has been met.

The parties are in dispute as to whether the Trustee has carried his burden of proof on the fifth element of a preference, i.e., whether the transfers enabled Super Valu to receive more than it would receive in liquidation of the debtor's business.

This divergence between the parties rests largely upon their differing perception of the legal effect of Super Valu's floating lien against the debtor's inventory, receivables and cash receipts.

The parties agree that Super Valu had a perfected security interest granting it a first lien in all of debtor's present and after-acquired inventory, furniture, fixtures and new equipment and a second priority lien in debtor's used equipment.

Super Valu asserts that its security interest attached to everything in the debtor's possession at the date of closing, November 25, 1985. Therefore, Super Valu reasons that the Trustee must prove Super Valu received an amount greater than its secured debts.

The Trustee asserts that under 11 U.S.C. § 547(e)(3), a security interest cannot attach until the debtor has acquired rights to the property in question; that a security interest is voidable to the extent it attached within 90 days of the filing of the petition in bankruptcy. Therefore, the Trustee asserts that Super Valu's security interest in inventory delivered and receivables generated subsequent to November 15, 1985 constitute property acquired by the debtor during the preference period and thus Super Valu's security interest therein must be rejected.

The Trustee asserts that Super Valu's security interest in inventory and receivables, to the extent that the security interest attached during the preference period, is avoidable as a preference, that Super Valu was therefore unsecured as to such assets, and therefore, when it received a percentage of its unsecured indebtedness, while other unsecured creditors received no payment, it enjoyed a preference voidable under § 547.

Bankruptcy Code § 547(e)(3) states, "for purposes of this Section, a transfer is not made until the debtor has acquired rights in the 'property transferred'." It thus appears that absent some exception protecting Super Valu, all security interests in inventory acquired during the preference period are voidable.

■ However, § 547(c)(5) specifies that the trustee may not avoid a transfer

that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims of any amount by which the debt secured by such security interests exceeded the value of security interests for such date ... 90 days before the filing of the petition.

Therefore, the attachment of Super Valu's lien to such collateral is only voidable (1) to the extent that Super Valu improved its position over what it was ninety days prior to the bankruptcy; and (2) only to the extent such improvement was to the prejudice of debtor's unsecured creditors.

### C. Did Super Valu Improve Its Position

■ The evidence reflects that at the beginning of the day on the first day of the preference period, November 15, 1985, the debtor had obligations to Super Valu and to Marine Bank in the following amounts:

| | |
|---|---|
| (a) balance due to Super Valu on Promissory Notes | $ 283,803.42 |
| (b) balance due to Super Valu for goods and services on open account | $ 414,376.14 |
| (c) balance due to Marine Bank | 914,592.95 |
| | $1,612,772.51 |
| Value of debtor's assets, November 15, 1985, including bank balance of $62,513.31 | 1,490,205.46 |
| Super Valu deficit November 15, 1985 | $ 122,567.05 |

Comparing the above with the figures at the date of the store's closing, November 25, 1985, we find Super Valu improved its position:

| | |
|---|---|
| (a) balance owed to Super Valu on Promissory Notes | $ 284,935.35 |
| (b) balance owed to Super Valu for goods and services | 305,697.63 |
| (c) balance owed to Marine Bank | 916,840.33 |
| | $1,507,473.31 |
| Agreed value of debtor's assets November 25, 1985 including bank balance of $10,405.66 | 1,438,097.81 |
| Super Valu Deficit November 25, 1985 | $ 69,375.50 |

Super Valu improved its position by $53,191.55 during the preference period.

Accordingly, Super Valu's floating lien on inventory is void to the extent of $53,191.55 and that amount is available to unsecured creditors.

■ Super Valu asserts that payments made during the preference period were made in the ordinary course of business. We disagree. Super Valu continued to direct payments to itself by drawing checks on the debtor's bank account while payments to all other suppliers had stopped. Whether or not the debtor had directed Super Valu to do this, Super Valu was aware that this was not the ordinary course. Further, during this time the debtor and Super Valu had already agreed upon a course of action which would result in Super Valu's repossession of all the debtor's assets.

■ In calculating the change in position, the new value of goods and services supplied by Super Valu is taken into account. Super Valu is not entitled to a further reduction of the preference amount. Super Value will be permitted to increase its unsecured claim and share in a prorata distribution to unsecured creditors.

Super Valu alleges that there was no prejudice to the debtor's unsecured creditors and even if the unsecured creditors were prejudiced, the voidable preference should be limited to $19,440.93, estimated by Super Valu to be the amount of vendor deliveries during the preference period. Again, we disagree. The Outside Vendors are prejudiced by the amount they are entitled to receive as a distribution on their unsecured claims.

### Commingling of Proceeds

The Trustee asserts that proceeds from the sale of inventory delivered to the debtor prior to the preference period were commingled with funds in which Super Valu has no claim to a security interest and that, under Pennsylvania's Uniform Commercial Code, 13 Pa.C.S.A. § 9306(d), Super Valu is not entitled to its security interest in any of the proceeds generated during the preference period.

13 Pa.C.S.A. § 9306(d) provides:

(d) *Effect of insolvency proceedings.—* In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(1) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

. . .

(4) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds but the perfected security interests under this paragraph is:

(i) subject to any right of set-off; and

(ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten (10) days before the institution of the insolvency proceedings less the sum of:

(A) the payments to the secured party on account of cash proceeds received by the debtor during such period; and

(B) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (1) through (3).

Super Valu was granted a broad security interest which extended to all existing and after-acquired inventory, including the proceeds of that inventory. Super Valu thus had a claim in every item of inventory delivered to the debtor, regardless of when or by whom such inventory was delivered.

The filing of the debtor's bankruptcy petition does not void Super Valu's claim to a perfected security interest in this collateral. The filing of the bankruptcy petition allows the Trustee an opportunity to avoid Super Valu's interest in such collateral. Therefore, at the time proceeds from the sale of collateral were deposited into the debtor's checking account, there was no commingling of funds and 13 Pa.C.S.A. § 9306(d)(4) is not applicable.

The debtor's checking account contained only the proceeds of inventory sold by the debtor. The account constitutes a separate deposit account within the meaning of 13 Pa.C.S.A. § 9306(d)(1).

Accordingly, Super Valu is entitled to the proceeds which were generated from the sale of inventory except for the amount by which Super Valu improved its secured position during the preference period.

An appropriate order will be entered.

### ORDER

This 23rd day of April, 1990, in accordance with the accompanying OPINION, it shall be, and hereby is, ORDERED:

1. Charlie Brothers Company, a Division of Super Valu Stores, Inc. received a preferential transfer from J.A.S. Markets, Inc., trading as Meadville County Market in the amount of $53,191.55.

2. Charlie Brothers Company, a Division of Super Valu Stores, Inc., shall disgorge to William Pineo, Esq., Trustee, the sum of $53,191.55 for the benefit of the estate.

3. Charlie Brothers Company, a Division of Super Valu Stores, Inc., shall be permitted to increase its unsecured claim by this amount and shall receive its pro rata share of the distribution to unsecured creditors.