NELSON CO.

v.

AMQUIP CORPORATION.

Civ. A. Nos. 90–6507, 90–8076.
Bankruptcy No. 89–12080.

United States District Court,
E.D. Pennsylvania.

July 11, 1991.

Myron A. Bloom, Robert M. Bovarnick, Lewis H. Gold, Adelman, Lavine, Gold and Levin, Philadelphia, Pa., for Nelson Co.

Maxwell P. Gorson, Philadelphia, Pa., for Counsel for the Official Committee of Unsecured Creditors.

Jonathan E. Rich, Newtown, Pa., for AmQuip Corp.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

## MEMORANDUM

GILES, District Judge.

Debtor Nelson Company ("Nelson") contests the bankruptcy court's determination that AmQuip Corporation ("AmQuip") holds a secured claim, arguing that AmQuip's interest is unsecured because the circumstances under which that interest was transferred make it avoidable under 11 U.S.C. § 547(b). Specifically, Nelson contends that it granted a preferential interest to AmQuip within the 90–day period preceding its Chapter 11 filing. How-

ever, the bankruptcy court rejected this conclusion, ruling that AmQuip had, in fact, acquired a judgment interest prior to the statutory 90–day period, causing that interest to be secured and nonavoidable.[1] Under the discussion which follows, this court agrees that AmQuip's interest is secured and affirms the orders [2] of the court below.

## I. FACTUAL BACKGROUND

The material facts are taken from a stipulation between the parties and from testimony taken at the June 4, 1990 bankruptcy court hearing.

On March 6, 1989, AmQuip filed a Complaint in Confession of Judgment in the Court of Common Pleas of Delaware County, Pennsylvania, pursuant to which judgment was entered against Nelson in the amount of $349,734.32. The judgment created a lien on real property owned in Delaware County.[3]

On March 10, 1989, Nelson filed timely a Petition to Open and/or Strike the Confessed Judgment. On May 22, 1989, counsel for the parties appeared in court and testified as follows concerning Nelson's challenge to the confessed judgment:

Your Honor, we have reached a tentative settlement, and jointly request that the Court hold this matter in abeyance for one week so we can work out the details. Basically, the settlement agreement, that we have arrived at in principle, is that we would stipulate to strike the present judgment, that we would then enter a judgment by consent, which would be for the uncontested amount between the parties. It would not include an attorney's fee. It would include an interest, which we still have to work out the details of, and the parties would then enter into a side agreement by which plaintiff would agree to stay execution, pending the outcome of the litigation that we expect to bring very shortly against the contractor and the owner.

*In re Nelson Co.*, 117 B.R. 813, 815 (Bankr. E.D.Pa.1990).

On June 1, 1989, counsel for Nelson faxed a proposed consent order and cover letter to counsel for AmQuip. However, before AmQuip replied, Nelson filed on June 5, 1989, a voluntary petition to proceed under Chapter 11 in bankruptcy court. Subsequently, AmQuip refused to sign the proposed consent order, and, on or about July 26, 1989, it elected to file a proof of claim in the bankruptcy court in the amount of its state court confessed judgment against Nelson, and asserted a lien on Nelson's property arising therefrom.

On August 9, 1989, the state court litigation involving the confessed judgment was removed as a matter of course to the bankruptcy court. On August 30, 1989, counsel for AmQuip informed Nelson's counsel that AmQuip had changed its mind and was then willing to sign the proposed consent order. Counsel for both parties and for the committee of unsecured creditors submitted an agreement to the bankruptcy court allowing it to lift the automatic stay imposed by 11 U.S.C. § 362(a) so that the consent order could be entered in state court. The bankruptcy court ratified the agreement on November 28, 1989, and the

---

**1.** The bankruptcy court issued its decision on August 22, 1990. That decision is reported as *In re: Nelson Co.*, 117 B.R. 813 (Bankr.E.D.Pa. 1990). Along with the committee of unsecured creditors, Nelson filed a motion for reconsideration, which was denied on November 16, 1990. Civil Action No. 90–6507 represents Nelson's appeal of the initial ruling. Civil Action No. 90–8076 represents Nelson's appeal of the denial of its motion for reconsideration. Pursuant to 28 U.S.C. § 158(a), this court has jurisdiction over both appeals. Because the issues raised in the second appeal include those raised in the first, this court has consolidated the two appeals.

**2.** *See supra* note 1.

**3.** 42 Pa.Cons.Stat.Ann. § 4303 *et seq.* (Purdon 1981). Section 4304(a) reads in pertinent part: "Any judgment or other order of a court of common pleas for the payment of money shall be a lien upon real property ... when it is entered of record and indexed in the office of the clerk of the court of common pleas of the county where the real property is situated, or in the office of the clerk of the branch of the court of common pleas embracing such county." It is this real property lien which secures AmQuip's claim against Nelson, provided that such lien was created by a nonavoidable transfer of interest.

state court approved the consent order on December 15, 1989:

### CONSENT ORDER

AND NOW this 1st day of June, 1989 it is hereby stipulated and agreed by counsel on behalf of the parties as follows:

1. The confessed judgment entered on or about February 28, 1989 is hereby stricken.

2. Judgment is entered in favor of Amquip and against Nelson in the principal amount of $291,712.46 plus interest at 18% from 30 days after the date of each invoice to March 1, 1989, and at the legal rate of post-judgment interest thereafter.

*In re Nelson Co.*, 117 B.R. at 815–16. In light of this consent order, AmQuip filed an amended proof of claim on or about February 1, 1990, reducing its claim to $291,-712.46 plus interest.[4]

### II. 11 U.S.C. § 547(b)

Nelson does not challenge the amount stated in AmQuip's amended proofs of claim[5] but challenges AmQuip's status as a secured creditor. Nelson premises its argument upon 11 U.S.C. § 547(b), which provides in relevant part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ...

... and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title; and

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of the title.

Nelson argues that the transfer to AmQuip of an interest in its property is avoidable because that transfer satisfies all five aspects of § 547(b). Both parties agree that the first, second, third and fifth elements are met. At some point during Nelson's insolvency, a transfer was made for AmQuip's benefit on account of an antecedent debt owed by Nelson, and the transfer improved AmQuip's position as a creditor. The dispute, then, comes down to whether such transfer was made within or before the 90–day "reachback" period.

As the party seeking to avoid a transfer of interest, Nelson carries the burden of establishing all of the elements of § 547(b). 11 U.S.C. § 547(g). In attempting to meet this burden, Nelson argues that the agreement embodied in the consent order was reached sometime between May 22, 1989, and June 1, 1989, and that, according to that agreement, the March 6, 1989 judgment was stricken and was replaced by a new judgment, representing a contemporaneous transfer of interest. Since Nelson filed for bankruptcy on June 6, 1989, any transfer which took place between May 22, 1989, and June 1, 1989, would fall within the 90–day period. In the alternative, Nelson argues that, even if the agreement embodied in the consent order did not abrogate the transfer of interest which occurred on March 6, 1989, but merely modified it, that interest can still be avoided because it fell within the applicable 90–day period.

AmQuip denies that any transfer took place between May 22, 1989, and June 1, 1989. It argues that no agreement was reached at that time, and that, in any

---

**4.** This represented a reduction in the principal amount of $58,021.86.

**5.** AmQuip filed a second amended proof of claim which merely updated the first by computing interest up to March 1, 1989, and adding that to the principal. The total became $309,-673.04, plus interest running from March 1, 1989.

event, the agreement which eventually was reached did not nullify the March 6, 1989 transfer of interest but merely modified it. Having fixed March 6, 1989, as the date at which a transfer of interest occurred, AmQuip argues that that date falls *outside* the applicable 90–day period.[6]

## III. THE CONSENT ORDER

Nelson claims that the consent order created a transfer of interest sometime between May 22, 1989, and June 1, 1989. The first part of Nelson's claim pertains to the intent of the consent order, and the second concerns its effective date.

### a. *Intent of the consent order*

Nelson argues that the terms of the consent order are clear, and that they result in an abrogation of the judicial lien created on March 6, 1989. According to Nelson, the two paragraphs of the consent order dictated a two-step process: ·the March 6, 1989, confessed judgment was stricken, and then a new, reduced judgment was substituted as of the effective date of the consent order. According to this interpretation, there existed a moment during which AmQuip's interest in Nelson's property was extinguished, for "an order of a court striking a judgment annuls the lien of the judgment or of any execution issued on it." Explanatory Notes—1979, Pa.R.C.P. 2959(f) (citing 7 Stand.Pa.Prac. 244 §§ 223, 224). Subsequently, argues Nelson, AmQuip was granted a new, reduced judgment and a resulting lien on Nelson's real property.[7] The grant of this new judgment, says Nelson, constituted a contemporane-

ous transfer of interest as envisioned by § 547(b).

The bankruptcy court rejected Nelson's characterization of the consent order. It found an inconsistency in the terms of paragraphs one and two of the order and determined that such inconsistency created an ambiguity which it was forced to resolve. The second paragraph of the consent order called for a payment of "interest at 18% from 30 days after the date of each invoice to March 1, 1989, and at the legal rate of post-judgment interest thereafter." In the view of the bankruptcy court, "[s]triking a judgment is inconsistent with providing judgment interest from an earlier date." *Nelson,* 117 B.R. at 819. In other words, providing post-judgment interest from March 1, 1989, is inconsistent with the notion that the March 6, 1989, judgment was being stricken and being replaced by a later judgment.[8]

The bankruptcy court construed the consent order as an approved agreement to modify the initial judgment, rather than an agreement literally to strike it and replace it with a new, reduced judgment. The court based its conclusion on the overall circumstances of the matter before it: "Taken as a whole, the consent order appears to be a settlement of a dispute between Nelson and Amquip wherein Amquip agreed to the reduction of its judgment amount in return for Nelson's withdrawal of its challenge to the judgment." *Nelson,* 117 B.R. at 819 (footnote omitted). In construing the agreement as one to modify rather than one to strike, the bankruptcy

---

**6.** That Nelson and AmQuip can reach different conclusions as to the coverage of § 547(b) is made possible by the lack of a uniform approach in calculating the 90–day period. By counting forward from the date of the transfer, the transfer falls within the 90–day period. By counting backward from the date of the bankruptcy petition, the transfer occurs on the 91st day. *See infra* at 937.

**7.** *See supra* note 2.

**8.** In disputing the bankruptcy court's determination of an inconsistency, Nelson argues: "Even if the March 6, 1989 is accepted as the date of the judgment, how then could post judgment interest be awarded from a date preceding the

entry of that judgment[?]" Appellant's Brief, 22 n. 6. Nelson refers to the March 1, 1989, date after which post-judgment interest is levied. The simple answer to Nelson's question is that March 1, 1989, was mistakenly cited in paragraph two of the consent order as the day following the confessed judgment, just as paragraph one refers to the "judgment entered on or about February 28, 1989." It appears that the February 28, 1989, date is cited because the confessed judgment, though not entered until March 6, 1989, was dated February 28, 1989. Consequently, references in this memorandum to the March 1, 1989, judgment simply refer to the initial judgment, which was really entered on March 6, 1989.

court noted that it was resolving the ambiguity against Nelson, since its counsel appeared to have drafted the document. *Id.*

■ This court agrees with the bankruptcy court's analysis. Notwithstanding Nelson's assertion to the contrary, it is significant that March 1, 1989, is the date cited in the consent order from which "post-judgment" interest begins to run. The use of the term "post-judgment" to relate to interest that begins to run on March 1, 1989, supports the conclusion that March 1, 1989, is the judgment date which the parties had in mind.[9] This creates a conflict with paragraph one of the consent order if the term "stricken" is given its normally ascribed meaning. The court is thus forced to resolve the contractual ambiguity by construing the agreement as a whole, as well as considering any relevant extrinsic evidence.[10] *Linder v. Inhalation Therapy Services, Inc.*, 834 F.2d 306 (3d Cir.1987).

■ Once the consent order is viewed as a whole, and in light of the prior conduct of the parties, the order must be seen as a settlement agreement modifying the original judgment.[11] AmQuip obtained a confessed judgment to which Nelson submitted a challenge. Though timely challenged, the judgment continued as an effective order of the state court. Subsequently, AmQuip agreed to reduce the amount of its confessed judgment provided that Nelson withdraw its challenge, which it agreed to do.[12]

The agreement between Nelson and AmQuip is analogous to the settlement in *Lewis v. Diethorn*, 893 F.2d 648 (3d Cir.1990), where, within the 90-day reachback period, the trustee paid defendant creditors $15,-500 to drop the lawsuit which they had filed against the debtor. The Third Circuit ruled that the cash payment represented the debtor's obligation under a negotiated settlement, rather than a transfer "for or on account of an antecedent debt owed by the debtor," and that it was therefore not an avoidable transfer. Likewise, the grant of a (reduced) judgment to AmQuip contained in paragraph two of the consent order is part and parcel of a negotiated settlement rather than an avoidable transfer of property.[13]

9. The bankruptcy court was correct in stating that ambiguities are to be resolved against the drafter of the document at issue. *In re F.H. McGraw & Company*, 473 F.2d 465, 468 (3d Cir.1973), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312 (1973). Here, the bankruptcy court determined that Nelson's counsel drafted the document. That determination is one of fact, and as such it can only be overturned if found to be clearly erroneous. Bankruptcy Rule 8013. Nelson's counsel sent AmQuip's counsel a signed copy of the consent order on June 1, 1989. There is no previous copy of that document in evidence. This court does not find the determination that Nelson's counsel prepared that document to be clearly erroneous.

10. One of the points pressed by Nelson in its motion for reconsideration and on appeal is that the bankruptcy court should reopen the matter and afford it an opportunity to introduce parol evidence on the agreement. As noted by the bankruptcy court in its memorandum and order denying the motion for reconsideration, Nelson had ample opportunity to introduce such evidence at the June 4, 1990, bankruptcy hearing, when the court made explicit reference to the perceived ambiguity in the agreement. In addition, Nelson sought to reopen the record of the June 4, 1990, hearing on another point but did not seek to introduce additional parol evidence on the agreement. Accordingly, the

bankruptcy court properly rejected Nelson's eleventh hour effort to reopen the record. Memorandum, November 16, 1990, 5–6.

11. In any case, having affirmed the bankruptcy court's determination that the agreement was ambiguous, this court can only reverse the bankruptcy court's determination as to the meaning of the consent order if this court finds that determination to be clearly erroneous, since the interpretation of ambiguous writings call for determinations of fact. *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980).

12. Even if Nelson believed when entering into the agreement that the consent order was meant to abrogate the March 6, 1989, judgment, as well as the lien created by that judgment, such a belief would have been a unilateral mistake on the part of Nelson, and, as such, would not entitle Nelson to any relief. *Rusiski v. Pribonic*, 326 Pa.Super. 545, 474 A.2d 624 (1984) (citing *McFadden v. American Oil Co.*, 215 Pa.Super. 44, 257 A.2d 283 (1969)).

13. The *Lewis* court also stated that the exchange fell "within the statutory exception to the trustee's avoidance powers as set out in subsection (c)(1), since it was intended by both parties 'to be a contemporaneous exchange for new value

b. *Effective date of the consent order*

■ Even if Nelson were able to show that the consent order effected a transfer of property, it would only be avoidable if it fell within the statutory 90–day period. Nelson argues that it did fall within that period, because in the state court hearing held on May 22, 1989, counsel for the parties reported a negotiated settlement. A close look at the statement made on May 22, 1989, however, reveals that the parties merely reported a "tentative settlement". *Nelson,* 117 B.R. at 815. The language was conditional. The parties stated that they had arrived at an agreement "in principle", according to which they "would" make certain stipulations, "would" enter a judgment, but "would not" provide for attorney's fees. *Id.* Furthermore, the parties had yet to work out two aspects of the agreement: the interest rate to be applied to the principal judgment, and a commitment from the plaintiff to stay execution of the judgment. *Id.* Given the conditional

nature of the language used to describe what was referred to explicitly as a tentative settlement, and given the presence of material terms yet to be agreed upon by the parties, Nelson has failed to prove that an agreement was reached by May 22, 1989.[14]

■ Nelson further argues that, even if no agreement was reached by May 22, 1989, the consent order was effective as of June 1, 1989, since the order began with the phrase, "AND NOW, this 1st day of June, 1989...." This is simply not the case. In the context of § 547(b), the date of transfer is fixed not by the date on the document attesting to the judgment, but rather by the date on which the judgment is recorded. As the court stated in *In re Camp Rockhill, Inc.,* 12 B.R. 829, 832 (Bankr.E.D.Pa.1981), "the taking and recording of a judgment against the debtor's real property, thereby creating a lien and security for a debt, constitutes a transfer within the purview of Section 547."[15] In

---

... and [was] in fact a substantially contemporaneous exchange.' 11 U.S.C. § 547(c)(1)." Likewise, the consent order was intended by Nelson and AmQuip to be a contemporaneous exchange for new value and was in fact a substantially contemporaneous exchange. Nelson exchanged its right to contest the judgment for new value represented by AmQuip's reduction of the judgment amount. 11 U.S.C. § 547(a)(2) (new value includes "release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law").

Looked at differently, AmQuip exchanged $349,734.32 in principal for $291,712.46 in principal, plus the bonus of a litigation-free environment (or so it thought, until Nelson sought to avoid the transfer). In this sense the exchange is similar to that in *In re Quade,* 108 B.R. 681 (Bankr.N.D.Iowa 1989), where a transfer was ruled nonavoidable under § 547(c)(1). There, the Farmers Home Administration exchanged a mortgage on the debtors' 80–acre parcel for a mortgage on its 40–acre parcel, plus the bonus of the debtors' increased ability to pay off their debts because of the money they were able to earn by selling the now unencumbered 80–acre parcel.

**14.** Nelson seeks to rely upon the case of *Kazanjian v. New England Petroleum Corp.,* 332 Pa.Super. 1, 480 A.2d 1153 (1984), wherein a Pennsylvania appeals court overturned the trial court's determination that the parties had not reached an agreement because they had not memorial-

ized it in written form. While *Kazanjian* stands for the proposition that parties can form a binding agreement without putting it in writing, it does not dictate the same outcome in this case. Whether an oral agreement has been reached is quintessentially a question of fact, and the facts of *Kazanjian* are distinguishable from those of this case. In *Kazanjian,* counsel for one of the parties had written to the judge presiding over ongoing proceedings between the parties: "This matter now appears to be settled in that Mr. Spear and I have agreed on a lump sum figure. We are in the process of preparing the necessary papers. After they have been signed by the parties, they will be submitted to Your Honor for approval." *Id.* at 1158. The appeals court concluded: "Moreover, the record reveals that [the parties] negotiated an oral agreement on each and every term that was later formalized by the [unexecuted] writing, by January, 1978." *Id.* 480 A.2d at 1159. The court therefore concluded that a binding oral agreement had been formed, notwithstanding the fact that one of the parties died before executing the written copy of the agreement.

**15.** *See also* 42 Pa.Cons.Stat.Ann. § 8141(5) (Purdon 1982), which declares: "Amicable judgments [have priority] from the time the instruments on which they are entered are left for entry". While the consent order was dated June 1, 1989, it was not "left for entry" on that date, nor was there any other indication that the judgment was meant to take retroactive effect. Rather, it appears that the consent order re-

this case that date is December 28, 1989, not June 1, 1989.[16]

## IV. THE MARCH 6, 1989, CONFESSION OF JUDGMENT AND THE 90–DAY REACHBACK PERIOD

 Having affirmed the bankruptcy court's determination that the consent order did not effect a transfer of interest, it becomes necessary to examine whether the March 6, 1989, judgment fell within the 90–day period prescribed by § 547(b)(4)(A). Courts differ as to whether the 90–day period should be calculated by counting forward from the date of the transfer, or backward from the date of the bankruptcy petition. In some cases, as here, it makes a difference.

Counting forward from the date of the transfer, the 90th day is June 4, a Sunday. Bankruptcy Rule 9006(a) would therefore extend the 90–day period to Monday, June 5, 1989, the date on which Nelson filed for bankruptcy. Predictably, Nelson favors this method of computation, which places the transfer within the 90–day period and makes it avoidable. Counting backward from the date of the bankruptcy petition, however, the 90th day is Tuesday, March 7, 1989, one day after the fateful transfer. AmQuip, of course, favors this method of counting, which would render the transfer nonavoidable.

Bankruptcy Rule 9006(a) states that "[i]n computing any period of time prescribed or allowed by these rules, by the local rules, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included." This court must then determine which "act, event, or default" marked the starting point of the "designated period of time," that is, either the transfer of property, or the filing of the bankruptcy petition. Section 547(b)(4)(A) states that to be avoidable a transfer of property must be made "on or within 90 days before the date of the filing of the petition." In this court's view, the filing of the bankruptcy petition is the proper focal point in the context of § 547(b)(4)(A). It is only when a party files a bankruptcy petition that the possibility of avoiding a transfer arises. The 90–day period is fixed as of that date, and it can then be determined which transfers, if any, can be avoided.

Focusing upon the petition date and counting back 90 days from that date allows the court to fix an identifiable window of avoidability. Any transfer which falls within that window can be avoided, provided that it meets the other requirements of § 547(b). In contrast, the process urged by Nelson would require the court to count forward from each date of transfer. Where several transfers are contested, one would have to count forward several times instead of performing a single count beginning at the petition date. Both theoretically and practically, it makes more sense to begin with the petition date, and the backward-counting approach is more consistent with the purpose of § 547(b)(4)(A).

While courts differ as to which approach to take, those decisions espousing the backward-counting method of computation are more numerous, more recent, and better reasoned. This court is aware of nine such decisions [17] (excluding the decision here appealed). Only three favor the forward-counting method.[18] While statutory inter-

---

tained the June 1, 1989, date because Nelson's counsel originally proposed and sent the order on that date.

**16.** Likewise, it does not matter that the original confession of judgment was dated February 28, 1989. That judgment was entered on March 6, 1989, which became its effective date.

**17.** *In re J.A.S. Markets, Inc.,* 113 B.R. 193 (Bankr.W.D.Pa.1990); *In re Carl Subler Trucking, Inc.,* 122 B.R. 318 (Bankr.S.D.Ohio 1990); *In re Baker & Getty Financial Services, Inc.,* 98 B.R. 300 (Bankr.N.D.Ohio 1989); *In re Antweil,*

97 B.R. 63 (Bankr.D.N.M.1988); *Matter of Schneider,* 44 B.R. 961 (Bankr.W.D.Wisc.1984); *In re Enterprise Fabricators, Inc.,* 36 B.R. 220 (Bankr.M.D.Tenn.1983); *In re Larson,* 21 B.R. 264 (Bankr.D.Utah 1982); *In re Wolf,* 13 B.R. 167 (Bankr.D.Mass.1981), *aff'd sub nom. Harbor National Bank of Boston v. Sid Kumins, Inc.,* 696 F.2d 9 (1st Cir.1982); *In re B & M Contractors, Inc.,* 2 B.R. 110 (Bankr.N.D.Ala.1979).

**18.** *In re Ford,* 34 B.R. 93 (Bankr.W.D.Va.1983); *In re Fabmet,* 31 B.R. 414 (Bankr.W.D.N.Y.1983); *In re Mailbag International, Inc.,* 28 B.R. 905, 910 (Bankr.D.Conn.1983).

pretation is certainly not a game of numbers, the majority preference for the backward-counting method reinforces the conclusion which this court reaches by considering the statute itself. Those courts favoring the forward-counting method offer an unpersuasive rationale for their preference.[19] Therefore, the 90–day period must be determined by counting backward from the date of the petition. Accordingly, the transfer to AmQuip accordingly falls outside the 90–day period of avoidability. Thus, this court affirms the bankruptcy court's order denying Nelson's motion to declare AmQuip an unsecured creditor as well as its order denying Nelson's motion for reconsideration.[20]

**19.** In *Mailbag* and *Fabmet, see supra* note 17, it is argued that "[t]ime does not run backward," *Fabmet,* 31 B.R. at 416, so that a backward count is counterintuitive. In addition, it is argued that if one counts backward then "any extension [of the 90–day period beyond weekend days and holidays] would serve no useful purpose, because no act [remains] to be done at the end of the extended time." *Mailbag,* 28 B.R. at 910. These arguments simply do not make sense. The court's job is to look into the past and decide how far back to draw the line beyond which transfers are nonavoidable. This line-drawing exercise does not involve time running backward. As for the "useless extension" argument, the extension is not useless at all. If, for example, the court counts backward and finds that the 90th day falls on a Saturday, then the line of avoidability is drawn to include the preceding Friday. In fact, this is exactly what happened in *Fabmet* and in *J.A.S., see supra* note 16.

**20.** Nelson based its motion for reconsideration on the following four grounds: (1) the court should use a forward count under § 547(b)(4)(A), (2) the consent order unambiguously dictates that the March 6, 1989, judgment be stricken, (3) the court should reopen the record and allow Nelson to introduce parole evidence on the agreement, and (4) it is inappropriate to construe any ambiguity in the agreement against Nelson. As discussed above, all of these contentions are rejected.