In re John PRIOR, d/b/a Prior Oil Co., Debtor.

John PRIOR, Plaintiff,

v.

FARM BUREAU OIL COMPANY, Terry Sharp, Ann Lutz, James Lutz, Elvin Copple, The United States of America, d/b/a The Internal Revenue Service, Teton Royalty, a Texas Partnership, Lawrence Beal, State of Illinois Department of Revenue, Lackey & Lackey, P.C., and James F. Mezo, Defendants.

Bankruptcy No. 93–40768.
Adv. No. 94–4003.

United States Bankruptcy Court, S.D. Illinois.

Jan. 5, 1995.

██

Robert T. Bruegge, Edwardsville, IL, for plaintiff.

Craig R. Hedin, Mt. Vernon, IL, for Farm Bureau Oil Co.

Terry Sharp, pro se.

Terry Sharp, Mt. Vernon, IL, for Elvin Copple, James H. Lutz and Ann M. Lutz.

Gerald Burke, Asst. U.S. Atty., Fairview Heights, IL, for I.R.S.

Harold H. Pennock, Centralia, IL, for Teton Royalty.

Timothy Neubauer, Mt. Vernon, IL, for Lawrence Beal.

Archie Lawrence, Asst. Atty. Gen., Springfield, IL, for Ill. Dept. of Revenue.

Paula M. Newcomb, Benton, IL, for James F. Mezo.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

At issue in this Chapter 11 case is the validity and priority of competing judicial liens on oil produced from oil and gas leases in which the debtor owns an interest. The debtor, John Prior, owns overriding royalty interests in two oil and gas leases in Clinton County, Illinois, entitling him to a specific share of oil produced from the leases. The judgment creditors in question obtained liens against the debtor's oil interests as real estate and, additionally, obtained liens shortly before the debtor's bankruptcy against his personal property, including the debtor's share of oil from the Clinton County leases. The debtor, as debtor in possession, seeks to avoid these latter liens under 11 U.S.C. § 544(a)(1) and § 547 and, further, seeks a determination of the judgment creditors' rights to oil produced from the leases as a result of their liens on the debtor's real estate.

The facts are undisputed. In May 1991, Dowell Schlumberger, Inc., obtained a state court judgment against the debtor in the amount of $37,128.32 and, in June 1991, filed a memorandum of judgment in the Clinton County recorder's office, creating a lien on the debtor's real estate in that county. See 735 ILCS 5/12–101 (1993). In September 1991, First Bank & Trust Company of Mt. Vernon filed a memorandum of a state court judgment obtained against the debtor in the amount of $70,113.06 in the Clinton County recorder's office. These judgments were subsequently assigned to Teton Royalty and then to defendant, James Mezo ("Mezo"), the present owner. In January 1993, defendants Terry Sharp, Ann Lutz, James Lutz, and Elvin Copple ("Sharp group") obtained a $225,000 judgment against the debtor in the U.S. District Court for the Southern District of Illinois and, in February 1993, filed a memorandum of this judgment in the Clinton County recorder's office.

The debtor filed his Chapter 11 bankruptcy case on October 15, 1993. On June 9,

1993, more than 90 days prior to the debtor's bankruptcy filing, the Sharp group filed a citation to discover assets in the federal district court to enforce the judgment obtained against the debtor earlier that year. *See* 735 ILCS 5/2–1402 (1993). The citation was directed against Farm Bureau Oil Company ("Farm Bureau"), a pipeline company that purchased oil from the leases in question. The citation required Farm Bureau to appear at a citation hearing on July 19, 1993, for examination concerning "property, income, or indebtedness due" the debtor and to produce records of amounts paid to the debtor on wells from which Farm Bureau bought production. The citation included a provision prohibiting Farm Bureau from making payment to the debtor of any money "which is due or becomes due to him" until further order of the court or termination of the proceeding.

On July 19, 1993, the district court entered a turnover order following a hearing on the citation to discover assets. The court ordered Farm Bureau to cease making payments to the debtor until the Sharp group's judgment had been satisfied. The court further ordered that money due the debtor be immediately paid over to the Sharp group and that additional amounts "due hereafter" to the debtor likewise be paid to the Sharp group. In addition, the court directed Farm Bureau not to "honor any transfer or assignment of interest" of the debtor before satisfaction of the $225,000 judgment.

On October 5, 1993, less than 90 days before the debtor's bankruptcy filing, Mezo's predecessor in interest, Teton Royalty, served copies of the judgments obtained in 1991 on the sheriff of Clinton County, who levied upon the debtor's interests in the Clinton County leases. *See* 735 ILCS 5/12–111, 5/12–158 (1993). Farm Bureau had previously impounded all oil proceeds attributable to the debtor's interests in these leases upon being served in the citation proceeding on June 11, 1993.

Following his bankruptcy filing, John Prior, as debtor in possession, brought the present action to determine the validity and priority of the judicial liens of Mezo and the Sharp group with regard to oil produced from the Clinton County leases. Count I of the debtor's complaint seeks turnover of the oil proceeds claimed by the Sharp group, alleging that the Sharp group's lien was "not effectively served" pursuant to state law and is thus inferior to the interest of the debtor in possession under § 544(a)(1). Count II seeks to avoid the liens of both the Sharp group and Mezo as having been obtained within 90 days of bankruptcy and asserts that the debtor in possession holds a superior interest in the oil proceeds under § 547.[1] Finally, Count III requests the Court to distinguish between the debtor's real and personal property interests in the leases and to set aside the liens of the Sharp group and Mezo as to oil proceeds constituting personal property.

The Sharp group has filed a motion for summary judgment on the debtor's complaint, alleging that their interest in the oil proceeds is superior to that of both the debtor in possession and Mezo. The Sharp group asserts that by commencing the district court citation proceeding, they obtained a lien on the debtor's personal property including the oil proceeds from the debtor's leases, which preceded and was thus superior to the hypothetical judicial lien of the debtor in possession as well as Mezo's judicial liens obtained by service on the sheriff of Clinton County. They contend further that their judicial lien attached to the oil proceeds on June 11, 1993, when summons was served upon Farm Bureau in the citation proceeding, rather than on June 19, 1993, when the turnover order was entered. Since the service of summons occurred more than 90 days prior to the debtor's bankruptcy filing on October 15, 1993, the Sharp group maintains that their lien is not subject to avoidance as a preference under § 547.

1. In addition to the liens of Sharp and Mezo, Count II alleges that the debtor's interest under § 544(a)(1) and § 547 is superior to a lien of the Illinois Department of Revenue and a claim of the Internal Revenue Service for unpaid payroll taxes. The debtor acknowledges, however, that Lawrence Beal, who holds a mortgage on land subject to one of the leases, has a superior interest in the oil produced from that lease as "rents and profits" of the mortgaged real estate.

## I.

The Bankruptcy Code affords the trustee or, in this case, the debtor in possession various avoiding powers that enable the trustee to secure the debtor's property for equal distribution according to the terms of the Code.[2] *See* 11 U.S.C. § 1107(a) (ascribing powers of trustee to Chapter 11 debtor in possession). Under § 544(a)(1), the trustee acquires, as of the commencement of the case, the status of a hypothetical judicial lien creditor and can avoid any lien or encumbrance on the debtor's property that such creditor could avoid under state law, including the interest of a judgment creditor whose lien has not attached at the time of the bankruptcy petition. *See* 11 U.S.C. § 544(a)(1).[3] The trustee's power under § 544(a)(1) is dependent on state law, which, while not explicitly indicated, is incorporated by reference. *See* 4 *Collier on Bankruptcy*, ¶ 544.02, at 544–5 (15th ed. 1994). In the present case, therefore, the Court must look to applicable Illinois law to determine whether the citation proceeding brought by the Sharp group created a lien that attached to the debtor's property prior to bankruptcy so as to be superior to the trustee's lien under § 544(a)(1).

Like the avoiding power of § 544(a)(1), the trustee's power under § 547 to avoid preferential transfers of the debtor's property is similarly dependent on state law governing the creation of liens.[4] The Bankruptcy Code definition of "transfer" includes the fixing of a lien on property of the debtor, *see* 11 U.S.C. § 101(58), 4 *Collier on Bankruptcy*, ¶ 547.03[1][A], and, for purposes of § 547, a transfer is deemed to have been made when a judicial lien attaches to the debtor's property under state law. *Id.; In re Foluke*, 38 B.R. 298, 300 (Bankr.N.D.Ill. 1984). Thus, as in the case of the trustee's § 544(a)(1) claim, the Court must look to state law to determine whether the Sharp group, by means of the citation proceeding, obtained a lien that attached to the debtor's property within 90 days of bankruptcy so as to be avoidable under § 547.

The property here at issue is the debtor's share of oil proceeds from leases in which he has an interest.[5] Under Illinois law, oil in the ground constitutes land or real estate. Upon its extraction, however, it is classified as personal property and its sale and disposition is governed by personal property law. *See In re Fullop*, 125 B.R. 536, 539 (Bankr.S.D.Ill.1990), *aff'd as modified*, 6 F.3d 422 (7th Cir.1993). In this case, the debtor's oil has been, and continues to be, sold upon extraction to Farm Bureau, giving the debtor a right to payment or an "account," which constitutes intangible personal property. *See generally id.* at 540–41 (extracted oil and accounts arising from sale of the oil constitute personal property subject to provisions of Uniform Commercial Code). It is this property which the Sharp group sought to attach through the citation served on Farm

---

2. For ease of reference, the Court will refer hereafter to the debtor in possession as "the trustee."

3. Section 544(a)(1) states:
(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

4. Section 547 provides in pertinent part:
(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition;
(5) that enables such creditor to receive more than such creditor would [have received in a Chapter 7 liquidation case if such transfer had not been made].
11 U.S.C. § 547(b).

5. The property claimed by Sharp includes "all of the oil, gas, and its proceeds, in which the [debtor] has an interest and that is in, or will come into, the possession and control of [Farm Bureau]." *See* Brief In Support of Motion for Summary Judgment, filed July 19, 1994, at 1.

Bureau, who holds the oil proceeds pending payment to the debtor.

■ There has been considerable confusion under Illinois case law concerning the requirements for creation of a judicial lien on personal property, including intangible personal property. *See* Francis E. Stepnowski, *Less Than Perfected: Uncertainty in Illinois Judgment Lien Law,* 13 N.Ill.U.L.Rev. 33 (1992) [hereinafter *Less Than Perfected*]. The most fundamental method of enforcing a judgment is through execution and levy, whereby the creditor delivers a certified copy of the judgment (formerly a writ of execution) on the sheriff, who then levies on or seizes sufficient property of the debtor to satisfy the judgment amount. *See* 735 ILCS 5/12–111, 5/12–158. While the execution statute does not specifically provide for creation of a lien,[6] Illinois courts have held that a judicial lien is created on personal property of the debtor from the time the certified copy is delivered to the sheriff for service. *Levine v. Pascal,* 94 Ill.App.2d 43, 236 N.E.2d 425, 430 (1968); *Grimes v. Rodgers,* 263 Ill.App. 429, 434 (1931); *see Less Than Perfected,* at 37–38. There is conflict, however, on whether a lien obtained through execution is effective as to intangible property, since such property is not subject to levy as a "good" or chattel. *Compare Levine v. Pascal,* 236 N.E.2d at 430 (holding that creditor obtained lien on bank account by placing writ of execution in hands of sheriff) *with In re Marriage of Rochford,* 91 Ill.App.3d 769, 46 Ill. Dec. 943, 948–49, 414 N.E.2d 1096, 1101–02 (1980) (holding that no lien attached to intangible property upon an execution and levy); *see also Less Than Perfected,* at 41–42.

■ Another means of enforcing a judgment, the citation to discover assets, was originally a statutory procedure for obtaining information about a judgment debtor's as-

sets, but has evolved under Illinois law to become an enforcement mechanism, particularly with regard to intangible personal property of the debtor. *See Less Than Perfected,* at 43–48. The legislature enacted the precursor to the present statute in 1955, greatly expanding the court's power to apply assets to a judgment. *See* 735 ILCS 5/2–1402.[7] Under this statute, the court could order turnover of the debtor's assets, garnishment of funds due the debtor, or sale of discovered property. *See* 735 ILCS 5/2–1402(b), 2–1402(c) (now 735 ILCS 5/2–1402(c), 2–1402(d) (West Supp.1994)). However, until a recent amendment, the statute did not explicitly provide for creation of a lien, although provision was made for imposition of a restraining order to maintain the *status quo* during pendency of the citation proceeding. *See* 735 ILCS 5/2–1402(d) (now 735 ILCS 5/2–1402(f)(1) (West Supp.1994)).

In the absence of legislative direction concerning whether and when a lien was created in a citation proceeding, a conflict developed in both the Illinois and federal courts on this issue. *See Bloink v. Olson,* 265 Ill.App.3d 711, 202 Ill.Dec. 760, 763–64, 638 N.E.2d 406, 409–10 (1994); *Less Than Perfected,* at 44–52. While some courts ruled that no lien was created by a citation proceeding under Illinois law, *see Kaiser–Ducett Corp. v. Chicago–Joliet Livestock Marketing Center, Inc.,* 86 Ill.App.3d 216, 41 Ill.Dec. 651, 653, 407 N.E.2d 1149, 1151 (1980) (stating that "judgment can not become a lien against personal property unless a writ of execution is delivered to the sheriff to be properly executed"); *see also In re Jaffe,* 111 B.R. 701, 709 (Bankr.N.D.Ill.1990) (finding that initiation and service of citation did not create lien on debtor's bank account), others held that a lien was created when the court in the cita-

---

**6.** Instead, § 12–111 uses language of limitation, stating:

No lien of judgment shall bind the goods and chattels of the person against whom it is entered, until a certified copy thereof is delivered to the sheriff or other proper officer to be served....

735 ILCS 5/12–111.

**7.** Section 2–1402, entitled "Supplementary proceedings," provides in pertinent part:

(a) A judgment creditor ... is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor ... and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment.

735 ILCS 5/2–1402(a).

tion proceeding entered an order compelling turnover of the judgment debtor's property. *See General Telephone Co. v. Robinson,* 545 F.Supp. 788, 797 (C.D.Ill.1982); *see also* George W. Breitsameter, *A Comparison of Supplementary Proceedings and Creditor's Bills,* 70 Ill.B.J. 694, 695 (1982). Other courts ruled that a lien was created upon the initiation of the citation proceeding or upon service of the citation summons on a third party holding the debtor's property. *See Farm Credit Bank of St. Louis v. Lucas,* 152 B.R. 244, 247–48 (C.D.Ill.1993), *rev'd on other grounds, Appeal of Swartz,* 18 F.3d 413 (7th Cir.1994) (ruling that service of citation summons created lien on the debtor's property that was not subject to avoidance by bankruptcy trustee); *In re Foluke,* 38 B.R. 298, 301 (Bankr.N.D.Ill.1984); *Mid–West National Bank of Lake Forest v. Metcoff,* 23 Ill. App.3d 607, 319 N.E.2d 336, 340 (1974); *see also King v. Ionization Int'l, Inc.,* 825 F.2d 1180, 1188 (7th Cir.1987) (indicating, in dicta, that service of citation created lien on debtor's intangible assets).

In an apparent effort to clarify the legal effect of a citation, the Illinois legislature amended § 2–1402 to add a new subsection that expressly provides for creation of a lien. *See* 735 ILCS 5/2–1402(*l*) (West Supp.1994). Section 2–1402, as amended effective July 6, 1994, sets forth the procedural requirements for commencing a citation proceeding, *see* 735 ILCS 5/2–1402(a), 2–1402(b) (West Supp. 1994), and provides that a judgment "becomes a lien when a citation is served" according to this procedure. 735 ILCS 5/2–1402(*l*) (West Supp.1994). Section 2–1402(*l*) states in pertinent part:

(1) The lien binds nonexempt personal property ... of the judgment debtor as follows:

. . . . .

2) When the citation is directed against a third party, upon all personal property belonging to the judgment debtor in the possession or control of the third party or which thereafter may be acquired or come due the judgment debtor and comes into the possession or control of the third party

to the time of the disposition of the citation.

. . . . .

*This Amendatory Act of 1993 is a declaration of existing law.*

*Id.* (emphasis added).

The Sharp group's citation summons in this case was served almost a month before the effective date of the amendment to § 2–1402 and thus the statute as amended does not technically control whether a lien was created on the debtor's property. However, in light of the concluding sentence of § 2–1402(*l*), the statutory amendment is instructive concerning the meaning of the statute prior to amendment. *See Bloink v. Olson,* 202 Ill.Dec. at 764, 638 N.E.2d at 410. It is a primary rule of statutory construction to ascertain and give effect to legislative intent, and a court may consider a subsequent amendment in interpreting a statute's meaning before amendment. While an amendment is generally presumed to change the law as it formerly existed, this presumption is rebutted where the circumstances suggest otherwise. *Id.* Here, the final sentence of § 2–1402(*l*) reveals that the legislature intended this provision to clarify rather than to change existing law. As such, it serves as a strong indication of the original intent behind § 2–1402. *Id.; see also Appeal of Swartz,* 18 F.3d at 416–17 (observing, based on final sentence of § 2–1402(*l*), that amendment was designed to clear up confusion over the legal effect of a citation); *Podvinec v. Popov,* 266 Ill.App.3d 72, 203 Ill.Dec. 293, 297–98, 639 N.E.2d 613, 617–18 (1994) (Grieman, J., dissenting) (stating that facts of case, although occurring before adoption of amendment to § 2–1402, must be considered in light of amendment because amendment is, by its terms, declarative of existing law).

Retroactive application of a statutory amendment is proper where the amendment does not change the law but merely serves to clarify a previously ambiguous statute. *See Matviuw v. Johnson,* 111 Ill.App.3d 629, 67 Ill.Dec. 370, 373, 444 N.E.2d 606, 609 (1982). As discussed above, courts considering whether a lien is created by a citation proceeding under § 2–1402 have

often commented on the confusion in Illinois law and the lack of clear legislative direction on this issue. The present case is not an instance in which there has been a definitive interpretation of a statute based on express statutory language only to have the legislature correct such judicial interpretation by amendment. *Cf. Roth v. Yackley,* 77 Ill.2d 423, 33 Ill.Dec. 131, 133, 396 N.E.2d 520, 522 (1979) (refusing to give retroactive effect to amendment that changed prior law as determined by supreme court from express language of statute, despite language that amendatory act was merely a declaration of existing law). An amendment to change the law under such circumstances would, if applied retroactively, constitute an invasion by the legislature of the constitutional province of the judiciary to determine what the law is and apply statutes to cases. *See id.; Matviuw v. Johnson,* 67 Ill.Dec. at 373, 444 N.E.2d at 609.

■■■■■ In this case, the legislature has merely remedied a deficiency in the statute by expressly stating its intent that a lien is created upon the service of a citation summons under § 2–1402. A judicial lien is a creature of statute rather than of common law, *see Smith v. Toman,* 368 Ill. 414, 14 N.E.2d 478, 480 (1938); *Haugens v. Holmes,* 314 Ill.App. 166, 169, 41 N.E.2d 109 (1942), and it is the province of the Illinois legislature to determine how judicial liens may be obtained in this state. Since the legislature has clarified its intent regarding the creation of liens under § 2–1402, the Court will give effect to this intent by applying amended § 2–1402(*l*) to the facts of this case.

■■■■■ As stated previously, the Sharp group served their citation summons on Farm Bureau on June 11, 1993, and Farm Bureau began impounding oil proceeds attributable to the debtor's interest at that time. Under § 2–1402(*l*), service of the citation summons created a lien on all personal property of the debtor then in the possession of Farm Bureau and on all property coming due the judgment debtor "to the time of the disposition of the citation." 735 ILCS 5/2–1402(*l*). With regard to such property, the Sharp group's lien was prior in time and thus superior to that of other judicial lien creditors, including the trustee as hypothetical judicial lien creditor as of the commencement of the case. *See* 11 U.S.C. § 544(a)(1). Section 2–1402(*l*), while containing a caveat regarding the effectiveness of a citation lien against bona fide purchasers and lenders without notice of the citation,[8] nevertheless affords a judgment creditor obtaining such a lien priority over subsequent lien creditors such as the trustee. Thus, the Sharp group obtained a superior interest in the debtor's oil proceeds subject to the citation lien and, with respect to such proceeds, is entitled to summary judgment on that portion of the trustee's complaint that seeks to avoid their lien under § 544(a)(1).

The trustee's further claim that the fixing of the Sharp group's lien constituted a preferential transfer within 90 days of bankruptcy requires a determination of when transfer of the debtor's property occurred for purposes of § 547. *See* 11 U.S.C. § 547(b)(4)(A). Section 547(e)(2) provides in pertinent part:

(2) For purposes of this section ... a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at ... such time. ...

11 U.S.C. § 547(e)(2)(A). Section 547(e)(1)(B) further provides, with regard to personal property of the debtor, that

a transfer ... is perfected when a creditor on a simple contract cannot acquire a judi-

---

**8.** Section 2–1402(*l*) provides that "[t]he lien established under this section does not affect the rights of ... bona fide purchasers or lenders without notice of the citation." 735 ILCS 5/2–1402(*l*). Citing this provision, the trustee asserts that the Sharp group's lien is ineffective as to him because § 544(a)(3) gives him the rights of a bona fide purchaser. The trustee's rights under § 544(a)(3), however, are limited to those of "a

bona fide purchaser *of real property* [.]" 11 U.S.C. § 544(a)(3) (emphasis added). It is settled that the trustee does not have the rights of a bona fide purchaser of personal property. *In re Cosmopolitan Aviation Corp.,* 34 B.R. 592, 596 (Bankr.E.D.N.Y.1983); *see In re Marino,* 813 F.2d 1562, 1566 (9th Cir.1987). The trustee's argument, therefore, must fail in this case involving personal property of the debtor.

cial lien that is superior to the interest of the transferee.

11 U.S.C. § 547(e)(1)(B).

 Under Illinois law, nonconsensual or judicial liens such as the lien here at issue normally require no added step of "perfection" to be effective against third parties as is required for consensual liens under the Uniform Commercial Code. *See* 810 ILCS 5/9–301(1)(b); *Farm Credit Bank of St. Louis v. Lucas,* 152 B.R. at 247; *In re Bill Cullen Electrical Contracting Co.,* 156 B.R. 235, 237 (Bankr.N.D.Ill.1993). Although § 547(e)(1)(B) defines transfer in terms of "perfection," it specifies that such perfection occurs when the transferee obtains an interest that is superior to that of subsequent lien creditors. Thus, in the present case, the Sharp group's lien was "perfected" for purposes of § 547 once they served the citation summons on Farm Bureau and obtained a judicial lien on the debtor's oil proceeds that was prior to and, therefore, superior to other lien creditors.

 While some courts have held that a lien obtained by service of a citation summons is "perfected" only when a turnover order is entered in the citation proceeding making the creditor's rights fixed and unassailable, *see In re Lifchitz,* 131 B.R. 827, 833–34 (Bankr.N.D.Ill.1991); *In re T.M. Sweeney & Sons, LTL Servs., Inc.,* 120 B.R. 101, 106 (Bankr.N.D.Ill.1990), this Court finds no basis in federal or state law for such a ruling. *See Farm Credit Bank of St. Louis v. Lucas,* 152 B.R. at 247. Section 2–1402(*l*) creates a specific lien on the debtor's assets as of the service of the citation summons, and although the lien may lapse due to the passage of time or other circumstances, *see* S.Ct.R. 277(f) (citation proceeding terminates automatically after 6 months unless extended by court), it is not contingent for its existence on the outcome of the citation proceeding. *Id.* Nor is there any requirement under § 547(e)(1)(B) for entry of a turnover order to "perfect" this lien, as "perfection" occurs upon the lien's creation as a result of its priority over subsequent lien creditors. Rather, to the extent the turnover order in a citation proceeding orders the payment of money or property subject to a citation lien,

it constitutes the enforcement of a preexisting lien and is not avoidable as a preference even though entered during the 90–day preference period. *See* Robert E. Ginsberg and Robert D. Martin, *Bankruptcy: Text, Statutes, Rules,* § 8.04[c][2], at 8–65 to 8–66 (3d ed. 1992).

 In the present case, the Sharp group's citation summons was served on June 11, 1993, more than 90 days prior to the debtor's bankruptcy filing on October 15, 1993. Under § 2–1402(*l*), property subject to the lien created by service of the citation summons included property of the debtor then in the possession of Farm Bureau as citation respondent and property coming due the debtor during the course of the citation proceeding which came into the possession of Farm Bureau. *See* 735 ILCS 5/2–1402(*l*)(2). The turnover order, entered July 19, 1993, directed Farm Bureau to pay over money due the debtor that was held by it pursuant to the citation summons. Thus, money to be turned over to the Sharp group pursuant to the turnover order included proceeds from the sale of oil to Farm Bureau from the time of the service of the citation summons on June 11, 1993, to the date of the turnover order which terminated the citation proceeding on July 19, 1993. As to this property, which was covered by the citation lien obtained outside the 90–day preference period, the turnover order merely effected enforcement of the Sharp group's valid and preexisting lien, and transfer of the debtor's property pursuant to this lien was not rendered preferential by the timing of the turnover order.

 The district court's order, however, did not merely direct the turnover of monies then held by Farm Bureau but ordered that amounts coming "due hereafter" to the debtor likewise be paid to the Sharp group in satisfaction of their judgment. The district court, recognizing that oil was produced and sold on a periodic basis from leases in which the debtor has an interest, ensured that such sales would continue by prohibiting the debtor from executing a transfer order that would cause the oil to be sold to a pipeline company other than Farm Bureau. This part of the court's order, directing payment

of the debtor's interest in future oil proceeds, effected a transfer of property that had not already been transferred by the citation lien, as the Sharp group's citation lien covered only monies and property coming due the debtor until disposition of the citation proceeding and did not include the debtor's interest in future oil proceeds. Thus, the court's order directing turnover of this property .constituted an additional transfer of property of the debtor and did not merely effect a payment on a preexisting secured claim. This transfer enabled the Sharp group, as unsecured creditors, to receive more than they would have received otherwise in the debtor's liquidation, see 11 U.S.C. § 547(b)(5), and since this transfer occurred within 90 days of bankruptcy on the date of the turnover order, it constituted a preferential transfer subject to avoidance by the trustee under § 547(b).

■ There is a further reason why transfer of the debtor's interest in future oil proceeds is avoidable as a preference, and this reason potentially affects even a portion of the oil proceeds transferred by means of the citation lien. Section 547(e)(3) contains an exception to the rule of § 547(e)(2) that a "transfer" is made when it is perfected or at the time it takes effect if it is perfected at that time. See David G. Epstein, Steve H. Nickles and James J. White, 1 *Bankruptcy*, § 6-11, at 543 (1992) [hereinafter *Bankruptcy* ]. Section 547(e)(3) provides:

> For purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

11 U.S.C. § 547(e)(3). Under § 547(e)(3), a transfer does not occur until the debtor acquires rights in the property even if all the necessary steps for perfecting the transfer have been taken.

■ While § 547(e)(3) was enacted to deal with the Article 9 floating lien, it applies to every kind of transfer, including involuntary transfers such as judicial liens. *In re Gull Air, Inc.*, 90 B.R. 10, 16 (Bankr.D.Mass. 1988); *Bankruptcy*, § 6-15, at 553-54. Under the facts of this case, oil produced from leases in which the debtor has an interest is sold on a periodic basis to Farm Bureau, at which time the debtor acquires a right to payment for his interest. Until the oil is produced and sold to Farm Bureau, the debtor has no right to payment from Farm Bureau and no property interest to be transferred. Therefore, even if the district court turnover order had been entered more than 90 days before bankruptcy, transfer of the debtor's right to payment for oil to be produced in the future would not have occurred under § 547(e)(3) until the oil was sold to Farm Bureau and the debtor's right to payment arose. It goes without saying, then, that transfer of the debtor's right to future oil proceeds effected by the district court's turnover order of July 19, 1993, was within 90 days of bankruptcy since such transfer did not take place until the debtor acquired rights to payment for oil sold after that time.

■ With regard to oil proceeds subject to the Sharp group's citation lien, transfer of the debtor's right to payment was effective upon creation of the lien on June 11, 1993, as to oil proceeds owing to the debtor at that time. However, assuming that oil was sold continuously during the period the citation proceeding was pending from June 11 through July 19, 1993, transfer of oil proceeds subject to this lien did not actually occur until the oil was sold and the debtor's right to payment arose. The parties have not indicated the precise dates on which oil was sold during this period, but to the extent sale was made on or after July 16, 1993, within 90 days of the debtor's bankruptcy filing on October 15, 1993,[9] transfer of the debtor's interest in oil proceeds subject to the citation lien would have occurred within

---

9. While there is some disagreement concerning computation of the 90–day preference period, the majority view is that it should be computed by counting backward from the date of the petition rather than forward from the date of the transfer. *See In re Levinson*, 128 B.R. 365, 367 (Bankr. S.D.N.Y.1991); *In re J.A.S. Markets, Inc.*, 113 B.R. 193, 197–98 (Bankr.W.D.Pa.1990). Counting backward in this case and excluding the petition date as required under Bankruptcy Rule 9006(a), see Bankr.R. 9006(a), the 90th day preceding the bankruptcy filing was Saturday, July 17, 1993. Because this day fell on a weekend, Rule 9006(a) prescribes that the period is extended to the next business day or, in this case, July 16, 1993.

90 days of filing and would likewise be avoidable as a preference.

The Court finds, accordingly, that pursuant to the lien arising from service of their citation summons on June 11, 1993, the Sharp group has a valid lien on oil proceeds that came due the debtor from Farm Bureau between the dates of June 11, 1993, and July 15, 1993, inclusively. With regard to these proceeds, the Sharp group is entitled to summary judgment on that portion of the trustee's complaint seeking to avoid transfer of this property as a preference under § 547. With regard to oil proceeds for which payment came due on or after July 16, 1993, the Court finds that transfer of the debtor's interest pursuant to the citation lien and the district court's order constituted an avoidable preference under § 547. The Court will grant summary judgment for the trustee as to this property.

■ In their motion for summary judgment, the Sharp group seeks a further determination that their rights in the debtor's oil proceeds are superior to those of Mezo as judicial lien creditor. As stated previously, Mezo's predecessor in interest served a copy of its judgments on the sheriff of Clinton County on October 5, 1993, and thereby obtained a judicial lien on the debtor's personal property. *See* 735 ILCS 5/12–111. There is considerable doubt under Illinois law that this lien would be effective against the debtor's right to payment for oil sold to Farm Bureau, which is an "account" constituting intangible personal property. In any event, because this lien was obtained within 90 days of bankruptcy, it constitutes a preferential transfer of the debtor's property and may be avoided by the trustee under § 547(b).

In seeking a determination of the parties' respective priorities in the debtor's oil proceeds, however, the trustee and Mezo raise an alternative argument that the parties' rights are governed by real estate law because the extracted oil and accounts are the "proceeds" or product of the debtor's leasehold interests, which constitute real estate under Illinois law. The trustee and Mezo observe that although both Mezo and Sharp have judicial liens against the debtor's interests in the Clinton County leases, Mezo's

liens obtained by the recording of judgments in June and September 1991 are prior to the Sharp group's lien obtained in February 1993. Therefore, they assert, Mezo has a superior interest in the debtor's oil proceeds and must receive payment prior to payment of the Sharp group's lien.

■ In support of their argument, the trustee and Mezo rely on *In re Fullop*, 6 F.3d 422 (7th Cir.1993), in which the court ruled that a clause in the parties' loan documents granting the creditor a security interest in the "proceeds, product, offspring, rents, [and] profits" of the debtor's working interests in oil and gas leases gave the creditor a superior interest in oil extracted from the leases and in accounts from its sale once the creditor had taken affirmative action to enforce its lien on "profits" of the working interest. *See id.* at 429–31. While the *Fullop* opinion contained the statement that "[t]he working interest held by [the debtor] included the right to oil and gas produced from the premises and the proceeds therefrom, less any royalty payment to the lessor[,]" *id.* at 429, the creditor bank's right to extracted oil and accounts from the debtor's working interest arose as a result of the debtor's express grant of a security interest in such proceeds. Without such a grant by the debtor, the bank as mortgagee of the debtor's real estate interest would have had no right to the extracted oil and gas as proceeds of the real estate. *See In re Hess*, 61 B.R. 977, 979 (Bankr.N.D.Tex.1986) (ruling that "[w]hen oil and gas are produced, they become personal property and the lien of the Bank [as mortgagee] on real estate is subject to being lost unless the Bank's security documents cover production and are properly perfected as to personal property"). Thus, *Fullop* is limited in application to situations involving consensual liens on oil and gas interests and does not apply to the present case involving involuntary liens obtained by judgment creditors.

The Court has found no Illinois case that addresses the issue of the right of a judgment creditor with a lien on the debtor's real estate to oil and gas produced from that real estate, which constitutes personal property. However, the decision of *Onyx Refining Co.*

*v. Evans Production Corp.,* 182 F.Supp. 253 (N.D.Tex.1959) is instructive, as it was decided under Texas law which, like Illinois, regards an oil and gas leasehold as real estate and the oil produced from such lease as personal property. *See id.* at 256. A judgment creditor in that case obtained a judicial lien on the debtor's real estate, which, the court ruled, attached to the debtor's interest in oil and gas while it was in place. *Id.* The creditor contended that his lien also attached to oil produced from the land and to its proceeds in the hands of the purchaser. The *Onyx* court, noting that "operation of an oil and gas lease necessarily involves the change of character of the produced oil from realty to personalty" and that such change was not wrongful as to the lienholder's security because it protected against drainage to adjacent property, ruled that the judicial lien against the debtor's real estate did not extend to the proceeds of production attributable to the debtor's interest in the real estate. *Id.* at 257. The court analogized to standing timber, which is part of the realty and subject to a lien on the real estate but, when severed, becomes personalty and is freed from this lien. *Id.; see also Donley v. Youngstown Sheet and Tube Co.,* 328 S.W.2d 192, 194 (Tex.Civ.App.1959) (stating that judgment lien on real estate attaches to royalty interest of oil and gas lease as realty but not to rents, issues, and profits therefrom).

 Based on this reasoning, the Court finds that Mezo's prior lien on the debtor's leasehold interests as real estate did not attach to oil produced from these leases or to the debtor's right to payment for oil that was sold to Farm Bureau. The Court holds that the parties' rights to the oil proceeds held by Farm Bureau are defined by their interests as judicial lien creditors with respect to the debtor's personal property. Accordingly, for the reasons stated, the Court will grant the Sharp group's motion for summary judgment in part and deny it in part.

SEE WRITTEN ORDER.