**In re DIRECT AIR, INC., d/b/a Midway Connection, Debtor.**

**DIRECT AIR, INC., Plaintiff,**

v.

**FAIRCHILD AIRCRAFT, INC., a Delaware corporation, and National City Bank, Indiana, a national bank, Defendants.**

Bankruptcy No. 94 B 18897.
Adv. No. 95 A 00253.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 30, 1995.

Daniel R. Murray, Larry M. Wolfson, Jay S. Geller, Michael E. Kernan, Jenner & Block, Chicago, IL, for Plaintiff.

Paula K. Jacobi, Schwartz Cooper Greenberger & Krauss, Chicago, IL, for Fairchild.

Michael V. Hughes, D'Ancona & Pflaum, Chicago, IL, for National City.

### MEMORANDUM OPINION AND ORDER

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the bankruptcy filed in Chapter 11 of the Bankruptcy Code by the debtor-plaintiff, Direct Air, Inc. d/b/a Midway Connection ("Debtor" or "Plaintiff"). The case *inter alia* seeks to avoid preferential transfers and payments under 11 U.S.C. § 547(b) and § 544. Defendant Fairchild Aircraft, Inc. ("Fairchild") moved under Fed.R.Civ.P. 56, made applicable to these proceedings by Fed.R.Bankr.P. 7056, for summary judgment on Counts III and IV of the Adversary Complaint. Plaintiff Direct Air subsequently filed a cross-motion for summary judgment on the same Counts. These Counts do not implicate the co-defendant National City Bank.

Fairchild contends that Plaintiff Direct Air never had any property interest in the property relevant to Counts III and IV, and thus the transfer of that property was not an avoidable preference under either 11 U.S.C. § 547(b) or § 544. Plaintiff Direct Air contends that the disputed transactions underlying Counts III and IV were security agreements, that the Plaintiff did have a property interest, and that transfer of the property was an avoidable preference under either 11 U.S.C. § 547(b) or § 544. The pleadings, exhibits, affidavits, and statements of the parties filed in accordance with Local Bankruptcy Rule 402 have been considered.[1] For

---

1. Plaintiff filed its cross-motion for summary judgment on November 20, 1995, after all filings on the Defendant's motion had been reviewed and the ruling thereon had been prepared. Therefore, no response to Plaintiff's motion was ordered pending review of it and supporting papers. Because neither Plaintiff's cross-motion nor the exhibits attached thereto demonstrate a right to summary judgment, there is no need to require Fairchild to respond.

reasons discussed below, both motions are denied.

## I.  BACKGROUND

### A.  Undisputed and Contested Facts

Legal training is believed by some to hone skills in precise definition of relationships. With unhappy frequency, as here, such training results in drafting documents so as to enable each party to have contrary arguments as to their relationship, to cloud the issues rather than clarify.  Such was the effect of documents pertinent to issues here.

On September 8, 1993, Fairchild and Debtor executed a letter of intent, signed by officers of both Fairchild and the Debtor.  In the letter, the parties agreed in principle to sale of eleven new aircraft and to the lease or sublease of several new and used aircraft. The letter of intent explicitly stated that major shareholders of the Debtor would execute limited guarantees of Debtor's obligations under "New Aircraft subleases" and "Pre-owned Aircraft leases."  The letter also included an aircraft delivery schedule that listed delivery dates for seventeen aircraft between September 1993 and March 1995. The schedule included three pre-owned Metro III aircraft and fourteen new Metro 23 aircraft.  *Letter to Eugene Gauss from David E. Norgart,* September 8, 1993, Complaint Exhibit B.

On November 5, 1993, Debtor and Fairchild executed a number of documents that appear contradictory.  One of these documents, entitled "Aircraft Purchase Agreement" ("APA"), contained several internal contradictions.  In section I, paragraph A thereof, Fairchild purports to sell the Debtor fourteen Fairchild aircraft,[2] described as "Metro 23 Aircraft, Model Number SA227–CC, Serial Numbers TBD."  Pursuant to the section entitled "Dates," Fairchild was to deliver the Aircraft according to the schedule in Exhibit E.  However, this schedule lists delivery dates for seventeen, not fourteen airplanes.  Among the aircraft listed are three pre-owned Metro III aircraft; the re-

maining fourteen are New Metro 23 aircraft. The first three delivery dates indicate that Fairchild was to deliver one pre-owned Metro III on November 8, 1993, and two new Metro 23 aircraft shortly thereafter, one on November 10, 1993, and the other on November 15, 1993.  The schedule lists fourteen delivery dates after these three.  *See* Aircraft Purchase Agreement, Exhibit E, § 10, Complaint Exhibit D.

Although the first page of the APA ostensibly covers the sale of aircraft to the Debtor, the language in Exhibit E thereto speaks only of leases.  Exhibit E § 4 of the APA states that:

> [s]ubject to obtaining financing, Seller will lease or sublease to Buyer three (3) new Aircraft provided for in this Agreement ("Subleased Aircraft") for a term of thirteen (13) years at a monthly lease rate of $36,000 per month per Subleased Aircraft payable in advance.

Exhibit E § 6 of the APA also provides for the "lease" of three pre-owned Aircraft: "Seller will lease ... to Buyer up to three (3) pre-owned Metro III Aircraft (SA227–AC), serial numbers AC–610B, TBD, and TBD ('Pre-owned Aircraft')."

On November 5, 1993, the same day the parties executed the APA, several directors of the Debtor signed guarantee agreements. These guarantees also confuse the issue as to whether the agreements between Debtor and Fairchild were purchase and sale agreements or merely leases.  For example, the guarantees, which are virtually identical except for the guarantor's name, list Fairchild as "Lessor," and the Debtor as "Lessee."  The guarantee agreements, however, purport to guarantee "certain indebtedness" that arose "in connection with a certain transaction whereby Lessee [was] *purchasing* certain aircraft pursuant to the Aircraft Purchase Agreement No. PA078–TBD dated as of November 5, 1993 between Lessor and Lessee ... and a related lease dated November 5, 1993 ... of a Metro III (SA–227–AC) aircraft, serial number AC–610B...."  *Guarantee Agree-*

---

**2.**  Fairchild disputes that the APA provides for sale of fourteen Fairchild aircraft and argues that the agreement only provides for sale of eleven such aircraft.  The face of the document itself, however, contradicts this assertion.  *See Aircraft Purchase Agreement,* ¶ 1, Complaint Exhibit D.

*ments,* Complaint Exhibit G (emphasis added).

Debtor and Fairchild executed a "lease agreement" on November 5, 1993, for one aircraft, serial number AC–610B ("Aircraft 610B"). The monthly payment on Aircraft 610B was $26,500.00 for a term of eight years. *November 5 Lease Agreement,* Exhibit B, Complaint Exhibit E. Debtor took delivery of this aircraft on November 6, 1993.

Subsequently, on November 13, 1993, the Debtor and Fairchild executed another "lease" agreement for two other aircraft, model number SA227–CC, Serial numbers CC–840B ("Aircraft 840B") and CC–841B ("Aircraft 841B") (collectively the "New Aircraft"). The monthly payments on the New Aircraft were $37,500.00 each, also for a period of eight years. *November 13 Lease Agreement,* Exhibit B, Complaint Exhibit F. Pursuant to this agreement, Debtor took delivery of these two aircraft on November 11, 1993, and November 14, 1993, respectively.

These "leases" are virtually identical in terms, except for their execution dates. The "leases" state explicitly that Fairchild retained ownership in the Aircraft, and that the documents were merely leases and not conditional sales contracts. Section 4.4 of each lease, for example, states:

> At all times during the Term of this Lease, full legal title to the Aircraft shall remain vested in LESSOR to the exclusion of LESSEE, notwithstanding the delivery of the Aircraft to and the possession and use thereof by the LESSEE.

Likewise, § 5.1 of each lease states:

> Title to the Aircraft shall remain vested in LESSOR and LESSEE shall have no right, title or interest in or to the Aircraft except as provided herein.

Furthermore, the first page of each lease contains the following language:

> Lessor has assigned to Greyhound Financial Corporation certain of its right, title and interest in and to this lease to the extent that this lease constitutes chattel paper. . . .

Moreover, the "leases" are unclear as to whether the Debtor would have a right or obligation to retain possession of the Aircraft at the end of the leases. Article XXII, entitled "Options," merely states "Intentionally Left Blank."

On June 3, 1994, the Debtor sought to terminate its relationship with Fairchild. The termination letter asserted several instances in which Fairchild had allegedly breached its duties under the contracts, and stated that the Debtor had begun to make arrangements to return the aircraft pursuant to their mutual agreement. On June 10, July 7, and July 31, 1994, Aircraft CC–841B, Aircraft AC–610B, and Aircraft CC–840B (collectively "the Aircraft") were returned to Fairchild.[3] Subsequently, on September 21, 1994, Debtor filed for reorganization pursuant to Chapter 11 of the Bankruptcy Code.

### B. Pleadings and Procedural History

Debtor filed its bankruptcy schedules on October 24, 1994. Debtor's schedule B, Item # 20, sets out all "[o]ther contingent and unliquidated claims of any nature, including tax refunds, counterclaims of debtor, rights to setoff claims." Under that heading, Debtor listed Fairchild for "Counterclaims" in an unspecified amount. Under Item 25 of Schedule B, entitled "Aircraft and Accessories," no Fairchild aircraft were listed. Debtor also did not list Fairchild under its Schedule G, entitled executory contracts and unexpired leases.

Debtor did list Fairchild in both Schedule D and Schedule F as a secured and an unsecured creditor, respectively. Debtor likewise noted that it made ten payments to Fairchild between July 5, 1994, and September 21, 1994, the date on which Debtor filed for Chapter 11 relief, for a total of $83,396.78. Several of these payments occurred after the aircraft were returned to Fairchild.

On February 2, 1995, this Court authorized the Debtor to reject executory contracts and unexpired leases pursuant to a motion filed by the Debtor. Among the contracts and unexpired leases Debtor listed in its motion

---

3. Debtor characterizes the return of the Aircraft as a repossession, but Fairchild disputes this point. Fairchild, in its answer to the complaint and in its motions, merely states that the Debtor returned the Aircraft to Fairchild.

were two agreements between Fairchild and Debtor entitled: "A/C leases" and "Pilot Training Letter Agreement."

In the current action, Debtor maintains that the transactions in issue here were not leasing agreements, but conditional sales contracts. Debtor argues that the "leases" of November 5 and 13, taken together with the terms of the APA, the letter of intent, and the Directors' Guarantees, embody the terms of a conditional sales contract and not a lease agreement. The Debtor concludes that return of the Aircraft to Fairchild constituted a preferential transaction that is avoidable under either 11 U.S.C. § 547(b) (Count III) or 11 U.S.C. § 544 (Count IV).

Fairchild maintains, however, that the documentation merely embodies a leasing agreement, that the leases terminated upon return of the Aircraft to Fairchild, and that the Debtor at no time had any property interest in the Aircraft. To support this position, Fairchild points to the leases themselves, as well as to the fact that the aircraft were not listed in the Debtor's schedule of assets. Fairchild further argues that because this Court has previously allowed Debtor to reject these leases, pursuant to a motion by the Debtor that all potential rights under them were effectively terminated along with all obligations.

It is unclear from the face of documentation before the Court what was the actual relationship between Debtor and Fairchild. Documents that comprise a mish-mash of internal contradictions cannot define legal relationships merely by reading the papers.

## II.  *DISCUSSION*

### A.  Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred to the bankruptcy court under Local General Rule 2.33(A) of the Northern District of Illinois. Venue is proper pursuant to 28 U.S.C. § 1409. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). This matter constitutes a core proceeding under § 157(b)(2)(A), (F), and (O).

### B.  Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.Rule 56(c); Fed.R.Bankr.P. 7056. A court may render summary judgment upon the whole case or only a portion thereof. Fed.R.Civ.P. 56(e). Partial summary judgment is available where it disposes of at least one count of a complaint. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.*, 266 F.2d 200, 201 (7th Cir.1959); *Quintana v. Byrd*, 669 F.Supp. 849, 850 (N.D.Ill.1987).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist and that judgment should be granted in its favor as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The movant must inform the court of the basis for its motion and identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Id.* There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

The Court must view the underlying facts in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56. The existence of a material factual dispute is sufficient to prevent summary judgment if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

### C.  Avoidance Actions

Count III is brought under § 547(b) of the Bankruptcy Code. Section 547(b) permits a trustee or debtor-in-possession under Chapter 11 of the Bankruptcy Code to avoid

any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made—

        (A) on or within 90 days before the date of the filing of the petition; . . .

    (5) that enables such creditor to receive more than such creditor would receive if—

        (A) the case were a case under chapter 7 of [the Bankruptcy Code];

        (B) the transfer had not been made; and

        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1995). Section 547(e) provides that "a transfer is not made until the debtor has acquired rights in the property transferred." 11 U.S.C. § 547(e)(3); *see also Prior v. Farm Bureau Oil Co. (In re Prior)*, 176 B.R. 485, 496 (Bankr.S.D.Ill.1995) (holding that § 547(e)(3) applies to every kind of transfer).

■ Count IV is brought under § 544 of the Bankruptcy Code. Section 544 also permits a trustee or debtor-in-possession to avoid certain transfers of a debtor's property. Section 544(a) provides that the trustee stand in the shoes of the Debtor as against certain defined creditors and may avoid any transfer of property of the Debtor or any obligation incurred by the Debtor that is avoidable by such person. However, the Debtor must first have had a property interest in the underlying transferred property or obligation before an avoidance action may be taken under this provision. The extent of rights, remedies, and powers under § 544 are measured by the substantive law of the

jurisdiction governing the property in question. 4 *Collier on Bankruptcy,* ¶ 544.02.

Accordingly, if the Debtor has no underlying property interest in the Aircraft, an avoidance action under either § 547(b) or § 544 will fail. The issue for Fairchild's summary judgment motion, thus, is whether the facts, taken in a light most favorable to the Debtor, warrant a finding that the Debtor had a property interest in the Aircraft. The issue for Plaintiff Direct Air's cross-motion for summary judgment is whether the facts, taken in a light most favorable to Fairchild, warrant a finding that the Debtor had *no* property interest in the Aircraft. Because the documents presented to the Court, including the exhibits only recently presented in Plaintiff's cross-motion, obfuscate rather than clarify the true nature of the transactions, the only action warranted is a denial of both motions.

### Determination of status of agreement

■ To determine whether an agreement that purports to be a lease is a true lease or a security agreement, the court usually must look to state law. *Powers v. Royce, Inc. (In re Powers)*, 983 F.2d 88, 90 (7th Cir.1993) ("Ordinarily the existence, nature and extent of a security interest in property is governed by state law"); *Orix Credit Alliance v. Pappas*, 946 F.2d 1258, 1261 (7th Cir.1991); *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1142 (7th Cir.1982) ("By defining the term 'security interest' to include a lease intended as security, the drafters of the Code intended such disguised security interests to be governed by the same rules that apply to other security interests"). It is the Debtor's contention that in this case the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*, ("FAA") controls.[4] However, it is not necessary for this decision to determine whether the FAA, which creates a federal recording scheme, preempts the definition of a conditional sales contract.[5]

---

4. In its cross-motion, the Plaintiff–Debtor argues that the transaction qualifies as a "conditional sales contract" under the FAA *and* as a "disguised financing transaction" under U.C.C. § 1–201(37).

5. The Federal Aviation Act ("FAA"), *inter alia,* creates a national recording scheme for air commerce. Most courts have held that although the FAA operates to determine whether a valid recording has occurred, in most other aspects of secured transactions it does not preempt state law. *See, e.g., Bergquist v. Anderson–Greenwood*

In FAA § 40102, a "conveyance" is "an instrument, including a conditional sales contract, affecting title to, or an interest in, property." 49 U.S.C. § 40102(a)(19). The FAA defines a conditional sales contract as a contract

(A) for the sale of an aircraft, aircraft engine, propeller, appliance, or spare part, under which the buyer takes possession of the property but title to the property vests in the buyer at a later time on—

(i) paying any part of the purchase price;

(ii) performing another condition; or

(iii) the happening of a contingency; or

(B) to bail or lease an aircraft, aircraft engine, propeller, appliance, or spare part, under which the bailee or lessee—

(i) agrees to pay an amount substantially equal to the value of the property; and

(ii) is to become, or has the option of becoming, the owner of the property on complying with the contract.

49 U.S.C. § 40102(a)(18).

■ Taking the documents involved here in a light most favorable to the Debtor, it is possible to find that they comprise a conditional sales contract under § 40102(19)(B)(ii) of the FAA. According to the affidavit submitted by Mr. McLean, Debtor's chief financial officer, Debtor had agreed to pay an amount substantially equal to the value of the property. The value Debtor was paying for the New Aircraft was $37,500.00 per month for a period of eight years. Using a discount factor of 7.75%, the present value of these payments would total approximately $5.616 million. *See* McLean Affidavit; *November 13 Lease Agreement*, Exhibit B, Complaint Exhibit F. This is approximately equal to the stated purchase price (and presumed value) of the New Aircraft, namely $3.7 million. Furthermore, the fact that the "Options" sec-

tion was "intentionally left blank" at least creates a factual uncertainty sufficient to preclude summary judgment in this case. Taking the undisputed facts and documents in a light most favorable to the Debtor, the intention of the parties might have been to create an option for the "lessee" to become owner of the property upon compliance with the contract. Thus, pursuant to 49 U.S.C. 40102(a)(18)(B)(ii), the Court could find that the transaction was a conditional sales contract.

Taking the documents in a light most favorable to Fairchild, it is also possible that the two lease agreements were, in fact, merely lease agreements without any option or "interim financing," as alleged by Debtor. As already noted, the "Options" section was "intentionally left blank." As earlier discussed, this at least creates a factual uncertainty sufficient to preclude summary judgment in this case.

■ Alternatively, under Illinois state law, to determine whether an agreement that purports to be a lease is a true lease or a security agreement, the Court must look to the Illinois Commercial Code, § 1–201(37), which provides, in relevant part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation ... Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the

*Aviation Corp., (In re Bellanca Aircraft)*, 850 F.2d 1275, 1278 (8th Cir.1988) (holding that FAA does not preempt state law when determining date of perfection); *Gary Aircraft Corp. v. General Dynamics Corp. (In re Gary Aircraft)*, 681 F.2d 365, 372 (5th Cir.1982) (holding that FAA does not displace state law assignment of priorities to interests in aircraft), *cert. denied*, 462 U.S. 1131,

103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983); *Danning v. World Airways, Inc. (In the Matter of Holiday Airlines Corp.)*, 647 F.2d 977, 980 (9th Cir.1981) (holding that FAA merely preempts validity of recording as against third parties; failure to record with FAA did not invalidate lien as against debtor), *cert. denied*, 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982).

goods or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

810 ILCS 5/1–201(37) (1995). Section 1–201(37) also sets forth criterion which, found alone, would not be sufficient proof of a security agreement:

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

(c) the lessee has an option to renew the lease or to become the owner of the leased goods;

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

*Id.*

■ Under the Illinois statutory scheme, in determining whether an agreement that purports to be a lease is actually a security agreement, courts focus on three factors: "(1) whether the 'lessee' is required to make aggregate rental payments to the 'lessor' equalling the cost of the leased property plus

interest; (2) whether the option price to purchase the leased equipment at the end of the 'lease' is nominal; and (3) whether the lease term covers the total useful life of the equipment." *In re Hardy,* 146 B.R. 206, 209 (Bankr.N.D.Ill.1992); *see generally, Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258 (7th Cir.1991); *In re Marhoefer Packing Company, Inc.,* 674 F.2d 1139 (7th Cir. 1982); *In re Hispanic American Television Co., Inc.,* 113 B.R. 453 (Bankr.N.D.Ill.1990). "Substance rules over form and courts will look through a transfer absolute in form to find a secured transaction if that was the real intent of the parties." *Turk v. Wright & Babcock, Ltd.,* 174 Ill.App.3d 139, 142, 124 Ill.Dec. 102, 103, 528 N.E.2d 993, 994 (3d Dist.1988), *appeal denied,* 124 Ill.2d 562, 129 Ill.Dec. 156, 535 N.E.2d 921 (1989); *see also Meeker v. Beeson,* 76 Ill.App.3d 940, 943, 32 Ill.Dec. 468, 470, 395 N.E.2d 698, 700 ("in determining the character of an alleged lease of personal property the courts will disregard the mere form and the words and will endeavor to reach the substance of the agreement").

■ In the case at bar, the first factor is apparently satisfied. As noted above, the total amount of payments Debtor was to make to Fairchild, discounted at 7.75%, was the equivalent of the present value of the New Aircraft. As also noted, however, there remains a factual dispute between the parties as to whether there was an option to buy. Thus, at this point in the case, it is not possible to determine whether the price for any such option would be nominal. Likewise, the useful life of the Aircraft has not been demonstrated by either party.

In short, the record is not yet sufficiently developed to determine whether the Debtor had a property interest in the Aircraft. It is not yet clear whether the preference action under either § 544 or § 547(b) will stand or must fail. The agreements contain contradictory language, which make it difficult, at best, to determine the objective intent of the parties. Fairchild has failed to show that there is no material question of fact because, taking the facts in a light most favorable to the Debtor, the agreements could be viewed as security agreements. If the documents

are security interests, then a preference action under § 547(b) or § 544 might prevail. Fairchild's motion therefore must be denied. Likewise, the Debtor has failed to show that there is no material question of fact because, taking the facts in a light most favorable to Fairchild, the agreements could be viewed as leases. If the documents are leases, then a preference action would not stand either § 547(b) or § 544. Plaintiff's motion therefore must also be denied.[6]

### Judicial Estoppel and Collateral Estoppel

Fairchild's argument that the Debtor is judicially or collaterally estopped from asserting that the transactions are conditional sales contracts also fails. Collateral estoppel prevents a party from relitigating issues crucial to a prior judgment that were actually litigated or could have been litigated in the prior suit. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Collateral estoppel allows parties in a bankruptcy proceeding to avoid relitigation of issues determined in non-bankruptcy proceedings. *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987). Fairchild argues that the issue of whether the transactions were lease agreements or conditional sales contracts was actually litigated or could have been litigated in the prior motion to reject the leases and executory contracts pursuant to 11 U.S.C. § 365. However, because there was no litigation surrounding what was actually rejected, collateral estoppel cannot apply.[7]

Judicial estoppel may come into operation when collateral estoppel and res judicata are technically inapplicable. *See In re Cassidy,* 892 F.2d 637, 641 (7th Cir.1990) (*citing Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1168 n. 5 (4th Cir.1982)), *cert. denied sub nom Cassidy v. C.I.R.,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). Judicial estoppel is the doctrine that prevents a party that has successfully assumed one position in a legal proceeding to later assume a contrary position merely because its interest have changed. *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); *Cassidy,* 892 F.2d at 641. "The doctrine of [judicial] estoppel is intended to protect the courts rather than the litigants," and "to prevent litigants from 'playing fast and loose with the courts.'" *Cassidy,* 892 F.2d at 641

---

**6.** It should be noted that the additional documents presented with the Debtor's cross-motion do not in any way clarify the transaction. The Debtor submitted a "transaction summary" prepared by a Fairchild Aircraft salesperson in August 1993—approximately three months prior to the transaction. *Fairchild Aircraft Transaction Summary,* Cross–Motion Exhibit E. This document also speaks in terms of both "purchase" and "lease" and therefore does not help the Court determine the nature of the transaction.

The Debtor also submitted an internal memo between two Fairchild employees—Chester Schickling and David Norgart. *Schickling Memo,* Cross–Motion Exhibit F. This document, also dated approximately three months prior to the actual transactions, contains the following statement: "The $2.125 Million [unsecured debt already owed by the Debtor] needs to be rolled into the finance package if possible." From this single statement, Debtor would have the Court believe that this indicates that Fairchild offered, and the Debtor accepted, a series of sales that incorporated into the purchase price of each aircraft a prorated portion of this $2.125 million debt. This leap is unfathomable by the Court. The two promissory notes likewise do not assist the Court. *Promissory Notes,* Cross Motion Exhibit L. These notes relate, according to the Debtor, to an unrelated loan of $600,000.00 from Fairchild to the Debtor. Although both promissory notes reference the APA, it is unclear why. Finally, the copy of the complaint filed by Fairchild against the Debtor in Texas state court does not assist the Court. *Fairchild Complaint,* Cross–Motion Exhibit P. In the complaint, Fairchild appears to be alternatively pleading either a breach of the sales agreement or a breach of the leases. Fairchild may also be pleading a breach of the sales agreement in addition to an independent breach of the leases. In either case, we are still no closer to a resolution of this issue than prior to the submission of the cross-motion.

**7.** It is unclear whether the doctrine of collateral estoppel could ever apply to prior orders issued in the same bankruptcy proceeding. Cases in this area focus on avoiding relitigation of issues decided by other proceedings, but recognize the right of parties to take inconsistent positions in litigation. *See, e.g., Astor Chauffeured Limousine v. Runnfeldt Investment Corp.,* 910 F.2d 1540, 1548 (7th Cir.1990) (arguing that Fed.R.Civ.P. 8(e)(2) explicitly allows parties to file inconsistent pleadings within a single suit); *Klingman v. Levinson,* 831 F.2d 1292 (7th Cir.1987) (holding that collateral estoppel allows parties in dischargeability proceeding to avoid relitigation on issue previously decided in non-bankruptcy litigation). However, a ruling on that point is not necessary to pass on the pending motion.

(*quoting Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir.1953)).

In the Seventh Circuit, two limitations are recognized on the application of judicial estoppel. First, estoppel only applies if a party has taken a clearly inconsistent position. *Himel v. Cont'l Ill. Nat'l Bank and Trust Co.*, 596 F.2d 205, 210–11 (7th Cir. 1979). Also, the litigant must have convinced the court to accept its position in the earlier litigation. *Eagle Foundation v. Dole*, 813 F.2d 798, 810 (7th Cir.1988). "A party is not bound to a position it unsuccessfully maintained." *Cassidy*, 892 F.2d at 641. Judicial estoppel applies both to questions of fact and law. *Id.* at 641–42.

Fairchild argues that, because the Debtor did not list the Aircraft as assets, it is now precluded from arguing it had a property interest in the Aircraft. The Bankruptcy Code, however, broadly defines the property of a debtor's estate to include "all legal or equitable interests of the debtor and property as of the commencement of the case." 11 U.S.C. 541(a)(1) (1995). There is no exception for property not listed in Debtor's schedules. Property not scheduled is still property of the estate. *See, e.g., Miller v. Shallowford Community Hosp.*, 767 F.2d 1556, 1560 (11th Cir.1985) (holding that estate had cause of action even though debtor failed to list it as property of estate); *Mindlin v. Drexel Burnham Lambert Group (In re Drexel Burnham Lambert Group, Inc.)*, 160 B.R. 508, 514 (S.D.N.Y.1993) ("any asset not scheduled pursuant to 11 U.S.C. § 521(1) remains property of bankrupt estate"); *Behrens v. Woodhaven Assn.*, 87 B.R. 971, 973 n. 1 (Bankr.N.D.Ill.1988) (stating that property of debtor not scheduled was still property of estate).

Fairchild further argues that judicial estoppel applies because the Debtor had moved to reject certain leases and executory contracts between the Debtor and Fairchild pursuant to 11 U.S.C. § 365. It is not clear, however, that the agreements referred to in that motion—"A/C leases" and "Aircraft Pilot Training Letter"—are the actual transactions involved in this litigation. The entire transaction involved in Counts III and IV of this Adversary proceeding included as few as eleven and as many as seventeen aircraft, depending on how the agreements are read. The motion to reject could have only applied to agreements not fully consummated and embodied in "lease agreements (numbering between 8 and 14 agreements)," and not to the two consummated agreements that encompass Aircraft AC–610B, Aircraft 840B and Aircraft 841B. Fairchild has failed to show that the Debtor has taken a clearly inconsistent position in prior litigation, as required by *Himel. See* 596 F.2d at 210–11. Thus, Fairchild's estoppel argument also fails.

### III.  CONCLUSION

For the reasons stated herein, Fairchild's Motion for Summary Judgment and Plaintiff Direct Air's Cross–Motion for Summary Judgment will each be denied on both Counts III and IV.